UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TERENCE WELLS,                                     :

                    Petitioner,          :          07 Civ.  6982 (CM) (AJP)

          -against-               :          **REPORT AND RECOMMENDATION**

THOMAS RICKS, Superintendent,           :
Upstate Correctional Facility,
                           :
              Respondent.        :

                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ANDREW J. PECK, United States Magistrate Judge:**

**To the Honorable Colleen McMahon, United States District Judge:**

        Petitioner Terence Wells seeks a writ of habeas corpus from his July 6, 2001

conviction, after a jury trial in Supreme Court, New York County, of murder, attempted murder,

assault, burglary and weapons charges, and sentence totaling fifty years to life imprisonment.  (Dkt.

No. 2: Pet. ¶¶ 1-7.)  Represented by the Office of the Appellate Defender and the law firm of Dewey

& LeBouef LLP, Wells' habeas petition alleges that:  (1) "[t]he trial court violated the Equal

Protection Clause of the United States Constitution by denying Mr. Wells's <u>Batson</u> challenge when

the prosecutor's reason for using a peremptory strike [against one potential juror, Ms. Brown] was

discriminatory on its face, [thus] forcing Mr. Wells to be tried before a jury selected with race-based

discrimination" (Pet. ¶ 15); and (2) "Mr. Wells's Sixth Amendment right to be tried before a fair and

impartial jury was violated by the trial court's refusal to strike a newly-seated jury panel after a

prospective juror attested to the credibility of a key prosecution witness before the panel, from which jurors and alternates were ultimately chosen" (Pet. ¶ 21).  (<u>See generally</u> Dkt. No. 3: Wells Br.; Dkt. No. 10: Wells Reply Br.)

For the reasons set forth below, Wells' habeas petition should be <u>DENIED</u>.

## FACTS

Wells' conviction arose from the October 13, 1999 shooting and resulting death of two people and serious injury of two others during an attempted Manhattan bakery robbery.  <u>See</u> <u>People</u> v. <u>Wells</u>, 7 N.Y.3d 51, 54, 817 N.Y.S.2d 590, 592 (2006).  Wells was tried in June and July 2001 before a jury and Justice Charles Tejada.  (Dkt. No. 2: Pet. ¶ 14.)

## Voir Dire:  Batson Related

During voir dire, potential juror Corlis Brown introduced herself in response to the judge's questionnaire (<u>see</u> Voir Dire Transcript ("VD") 90),[1/] as follows:

> PROSPECTIVE JUROR [BROWN]:  Corlis Brown.  Age 55.  I live on the upper west side.  Rent.  I'm not familiar with the crime area.  I've lived in New York for 35 years.  Single.  I'm a postal clerk.  Two years of college.  Traveling and reading.  No legal training.  I can stay overnight in a hotel.  No and no.

(VD 93-94.)  In response to the prosecutor's follow-up questions, Brown stated that she read mysteries, but understood that a trial was different:

> [A.D.A.] SCHWARTZ:  Ms. Brown, you mentioned that one of your pas[t] time[s] was reading?

---

[1/]    Excerpts from the voir dire transcript are in Exhibit A to the Petition (Dkt. No. 2).  The entire voir dire transcript is Dkt. No. 15.

PROSPECTIVE JUROR [BROWN]:  Yes.

[A.D.A.] SCHWARTZ:  What kind of things [do] you enjoy reading?

PROSPECTIVE JUROR [BROWN]:  Mysteries.

[A.D.A.] SCHWARTZ:  Detective mysteries?

PROSPECTIVE JUROR [BROWN]:  Yes.

[A.D.A.] SCHWARTZ:  Can you understand that when you read a book you might get the whole narrative, the whole story, everything behind, everything else but here in court you might not get that?

PROSPECTIVE JUROR [BROWN]:  Yes.

[A.D.A.] SCHWARTZ:  And can you ask if you're left at the end of the case with questions that perhaps your book might have answered but that we haven't answered but you're nonetheless satisfied that as to the issue before you, you've heard evidence proving guilt beyond a reasonable doubt, even if your questions are important ones, can you agree that you only need to decide the issue the Judge puts before you and agree to set aside whatever residual questions you have that don't relate to guilt beyond a reasonable doubt?

PROSPECTIVE JUROR [BROWN]:  Yes.

[A.D.A.] SCHWARTZ:  Good.  Thank you.

(VD 106-07.)[2/]

---

[2/]    One other juror from that venire said he read, but that he read "history [and] science."  (VD 98 (David Fishman).)

The Court notes that subsequent prospective jurors, in response to the judge's questionnaire, said they read, but no one said they read mysteries.  (See VD 224 (Melissa Nathanson), VD 225 (Diane Miner), VD 225-26 (Brenda Lafontaine), VD 228 (Belleny Rosacruz), VD 360, 378 (Joel Hodes: "I like to read."  "Science books, science fiction, that type of thing."), VD 360 (Barbara Magnet:  "My interest[s] are reading history."), VD 361 (continued...)

4

In further response to the prosecutor's questions, Brown stated that she would accept police testimony the same as "civilian" testimony:

> [A.D.A.] SCHWARTZ: If you hear only testimony on a given subject from police officers, in other words, on that one subject you don't hear from civilians, can you accept the police testimony in the same way you would as [if] the same testimony was given by civilians?
>
> . . .
>
> [A.D.A.] SCHWARTZ: And how about turning to the opposite end, Ms. Brown?
>
> PROSPECTIVE JUROR [BROWN]: Yes.
>
> [A.D.A.] SCHWARTZ: Can you do the same, yes?
>
> PROSPECTIVE JUROR [BROWN]: Yes.

(VD 114.)

At the conclusion of the first round, the prosecutor exercised peremptory challenges to five potential jurors, including Brown. (VD 159.) Four jurors were seated, but excused from the courtroom during subsequent jury selection. (VD 162-63.)

At the conclusion of the second round of voir dire, Wells' attorney Joel Stein made a Batson challenge to the prosecutor's peremptory challenges, and the following colloquy occurred:

---

[2/]     (...continued)
(Cristy Nyberg), VD 500 (Kate Paulino), VD 502 (Deidre Loughman), VD 506 (Charles Tuthill), VD 512 (David Connors), VD 513 (Lana Vail), VD 617 (Matthew Beprecek), VD 619 (Elaine Haruvi), VD 619-20 (Iris Mantilla), VD 620 (Debra Charlton), VD 621 (James O'Brien).

[DEF. ATT.] STEIN: I have an application pursuant to <u>Batson</u> case. In the first round the People challenged juror number nine Corlis Brown, 55 year old black woman. In this round from the eight people they have challenged, they've challenged peremptorily[,] they've challenged juror number [three], Ms. Raymond, who is a 28 year old black woman. [VD 219.] They challenged . . . [j]uror number eight, Wilton James, [who] is a 63 year old black man [VD 221], and juror number twelve [, Frederick Disla, who] appears to be a light skinned black man, he's 19 years old [VD 222]. [<u>See</u> VD 278.] From my own perspective, trying to be objective, I don't see any particular reason from their backgrounds and information they have given us that would explain this pattern other than the fact that they're black.

THE COURT: Ms. Schwartz.

[A.D.A.] SCHWARTZ: Your Honor, I would disagree that there is a statistical showing of a pattern and I would point out --

THE COURT: It doesn't have to be any statistical showing, counsel. Listen to what I'm saying, what are your nondiscriminatory reasons for challenging Ms. Brown?

[A.D.A.] SCHWARTZ: Ms. Brown answered questions with her hand over her face, her hand over her mouth. That's something I'm very sensitive to. In my preparation of witnesses, it's part of what I tell people when I prepare them to testify, when you testify when someone is on the stand and talks with her hand over their mouth to people its signifies as a matter of body language something to hide.

In addition she has sort of an unsettling gaze that I just found difficult to deal with and additionally she also reminded me, I have to say of Judge Cropper which made me just somewhat anxious in a sort of an emotional way. So those were my concerns plus she reads[,] she indicated affirmatively she read detective stories, someone like that I think notwithstanding what she said might have [an] expectation of what should be part of a case.

THE COURT: I find that to be nondiscriminatory. Ms. Raymond.[3]

---

[3]     The sole <u>Batson</u> issue in this habeas petition involves venireperson Brown. (<u>See</u> pages 35-68 below.) The prosecutor's explanations for her striking of the other jurors are quoted for the sake of completeness.

[A.D.A.] SCHWARTZ:  Your Honor, you heard my cause challenge to Ms. Raymond [see VD 244-45, 265-67, 270-71], my peremptory are based on all those reasons and one more[,] which is she has a cousin in jail for murder for fifteen years [see VD 235, 240] and in general when someone has a relative in custody for a very serious offense like that, I find it difficult, that's almost an automatic peremptory challenge than anyone else unless there is something positive to over act that [and] in this case it just got worse.  I truly believe that the cause challenge should be granted.

THE COURT:  I find that a nondiscriminatory reason.  Mr. James.

[A.D.A.] SCHWARTZ: Part of the reason is Mr. James[,] in my experience with United States Department, it was in the bureau of the U.N. and U.N. procedure and I was there for two years prior to coming to the district attorney's office.  His involvement with the U.N., the United Nation[s] that is and his wife's involvement in the United Nation[s] are, therefore, troubling to me.  [See VD 231, 238-39, 241.]  They can convey to me a sort of liberal political philosophy that I also perceived in Ms. Cole, a white female, juror number four, the homeopathic medicine sort of triggered things to me of sort of liberal counter establishment sort of thing.  The U.N. has that affect on me.  In addition to those two reasons as to him, I thought when I asked him about the legal system of another country that his reaction to me was slightly hostile.  I just had that sense and finally although I guess I don't know -- so that was also reaction to it but really the U.N. connection.

THE COURT:  I find that to be nondiscriminatory.  And, Mr. Disla.

[A.D.A.] SCHWARTZ:  I don't believe Mr. Disla was black.  I was assuming that he was [H]ispanic and we also have [H]ispanic witnesses including one officer, the firing officer so I don't think that's an appropriate part of a Batson challenge.

THE COURT:  Counsel, please just tell me your reasons.

[A.D.A.] SCHWARTZ:  He's 19 years old, he's in school and it seems to me that someone that young who has not indicated that he has held a job, has shown no indication in his life experience that he can make a decision of this magnitude.  In contrast, Mr. Ramos who seems to me the same ethnic background as Mr. Disla is 21 and has a job and rents an apartment and has responsibility where Mr. Disla seems to me to be sort of in his life experiences too immature to make a decision of this magnitude.

THE COURT:  I find that to be a nondiscriminatory reason.  All right let's move on.  Peremptory challenges.

[DEF. ATT.] STEIN:  Judge, just so I'm clear up to and including thirteen?

COURT CLERK:  Right.

[DEF. ATT.] STEIN:  Number nine who is not Officer Jimenez but Mr. Jimenez in this context.  Number seven Mr. Chaitow.  That's it, Judge.

(Pet. Ex. A: VD 279-83, bracketed transcript references added.)[4]

**Voir Dire:  Defense Objections to A Subsequent Venire Panel**

After several more venire rounds led to more jurors being selected, the jurors seated to that point were excluded from the courtroom (VD 297-98, 407-08), another panel of prospective jurors was seated (VD 468-70), and one of them, Marcus Smalls, indicated that he knew one of the detectives who would be testifying at trial:

THE COURT:  All right, ladies and gentlemen, I'm going to ask you a series of questions concerning your background. . . .

Now, the easiest way to know if your answer is yes or no is by a show of hands and I'm asking all the questions at the same time and to make it easier for us, I'm going to call this one row, row two, and that will be row three.

The first question is the defendant Terence Wells, his lawyer Joel Stein, and the prosecuting attorneys Amy L. Schwartz and Bonnie Sard have been identified to

---

[4]     The prosecutor made a <u>Batson</u> challenge that "there seems to be a pattern of [the defense] striking individuals who are not of color. . . ."  (VD 285.)  Justice Tejada asked for defense counsel's reasons, and found them to be non-discriminatory.  (VD 287-88.)  The fact of the matter is that the venire, at least during the first two rounds of selection, had disproportionally few African Americans.  (<u>See</u> 2/21/08 Reconstruction Hearing Tr. Exs. 3-4: Prosecutor's Voir Dire Charts.)

8

you.  Do any of you recognize any of these persons personally or do you recognize their name[s]?

Marcus Smalls, yes, sir.

PROSPECTIVE JUROR [SMALLS]:  I think I read about it in the paper the incident that happened.

THE COURT:  But do you recognize any of these individuals?

PROSPECTIVE JUROR [SMALLS]:  Not personally, the names in the paper.

[DEF. ATT.] STEIN:  Judge, I can't hear.

THE COURT:  You don't recognize them, you don't know them personally?

PROSPECTIVE JUROR [SMALLS]:  Don't know them personally.

THE COURT:  And you don't recognize their name[s]?

PROSPECTIVE JUROR [SMALLS]:  I think I recognize the defendant's name from the newspaper article when it first ran.

THE COURT:  Is there anything about that fact that you think might affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR [SMALLS]:  Nothing at all, no.

. . . .

THE COURT:  . . .  Among the witnesses who may be called or names that you might hear during the course of this trial are the following and I caution you that my mentioning names poses no burden on either side to call any of these persons: . . . Detective Eddie Molina . . . .  Do any of you recognize any of those names as one you might know?

Marcus Smalls.

PROSPECTIVE JUROR [SMALLS]:  I know Eddie Molina personally, Detective Eddie Molina, we're good friends.

9

THE COURT: You know Detective Eddie Molina personally. So you're friends?

PROSPECTIVE JUROR [SMALLS]: Yes.

THE COURT: Is there anything about that fact that you think might affect your ability to be fair and impartial in this case?

PROSPECTIVE JUROR [SMALLS]: I think he's an honest guy so I would tend to be swayed by what he says.

THE COURT: You're excused. . . .

(VD 471-74.) At sidebar, Wells' counsel moved to strike the venire panel because of Smalls' comments:

[DEF. ATT.] STEIN: Judge, I'm asking that this panel be stricken because the prospective juror who was just excused, I think his name is Marcus Smalls, just announced in response to your Honor's question[,] I suppose he didn't intend it that way but that's how it came out, he announced I think he's an honest cop. Detective Molina is one of the principle witnesses in this case, he's one of the police officers who is allegedly in a shoot out with my client. His credibility is going to be sharply in question. For this panel to have heard this person announce from his own knowledge that he think[s] he's an honest cop, I think has tainted this panel. I'm sorry if it delays things but I think this is extremely important and very prejudicial.

THE COURT: You want to be heard.

[A.D.A.] SCHWARTZ: Your Honor, it strikes the People that an instruction from the court to tell the jury that they'll form their opinion of every witness and no comment made by any juror or no outside information of any kind about anyone's background or whatever of anyone has anything to do with it and the juror[s] should form their own opinion. I think that would cure any issue that Mr. Stein has.

[DEF. ATT.] STEIN: Judge, I think this really isn't something that can be undone. I'm not looking for more time to do this.

THE COURT:  Counsel, I heard you.  The application is denied and the application for an instruction is denied because I think it unnecessarily attracts attention.

(VD 475-76.)

Justice Tejada instructed and questioned that panel of potential jurors, as follows:

Each witness's testimony must be weighed upon its own merits.  Every defendant must be judged solely on the evidence.  We recognize that not everyone can do that.  Prospective jurors are human and may have prejudice or sympathies.  Some of you may have had unpleasant experience[s] that lead you to believe that members of a certain group are more or less honest or more or likely to be guilty of a crime or a particular crime or more or less likely to be accused.  Neither prejudice or sympathy may be allowed to interfere with your deliberations.  If anyone thinks he or she may have feelings favorable or unfavorable for any witness you are bound by your oath to say that.

. . . .

You must judge each witness as an individual and determine whether and to what extent you believe his or her testimony.  For example, a number of the People's witnesses in this case may be police officers, they will take the same oath as other witnesses.  The fact that a witness is a police officer or wears a police officer's uniform does not make him or her less credible.  Is there any of you who have any feeling about the police or have had experiences which would lead you to give a police officer's testimony any greater or lessor weight than anyone else's testimony?

. . . .

Now before we go to that question I just want to ask you another question and that is this, is there anything about any answers to any questions or any statements made by any other prospective juror that any of you feel might affect your ability to be fair and impartial in this case?

All right, we'll begin [answers to the questionnaire] with juror number one, . . . .

(VD 495, 499-500, emphasis added.)

At the conclusion of jury selection, defense attorney Mr. Stein raised an additional objection to the panel that had heard Marcus Smalls talk about Detective Molina, as follows:

THE COURT:  We have a jury.  We will see you at 2:45.

[DEF. ATT.] STEIN:  Can I say something?

THE COURT:  Yes, go ahead.

[DEF. ATT.] STEIN:  Judge, this is concerning Marcus Smalls who I believe at the time was juror number fifteen who made the comment about Eddie M[o]lina, to put this in a context, a personal friend of his, and he said in the presence of all the other prospective jurors that he knows or believes this person to be an honest cop.

Detective M[o]lina is one of the police officers who is going to testify that he was in a shoot out with my client.

THE COURT:  Counsel, you told me you were going to have something new. You said all of that.  That was on the record.

[DEF. ATT.] STEIN:  The last thing that was said at the sidebar with the reporter, and the prosecutor asked for limiting instructions.

I wanted to say that I don't think there is any limiting instruction that would have cured this.

It was something that was much to[o] prejudicial given who Detective M[o]lina is in this case.

After the prosecutors asked for a curative or limiting instruction, Your Honor asked a question to the prospective jurors about whether there was anything that other prospective jurors had said.  I'm paraphrasing, I don't remember precisely how you said it, that might effect them in any[]way, and no one answered affirmatively.

I don't think that, very frankly, that sanitized the general question addressed, and I think the problem still exists and the only way for it to have been resolved is to strike the panel.

[A.D.A.] SARD:  Your Honor, as you know, you give an opening charge of a general nature, closing charge as well, and charges in-between from time to time that all encompass credibility.

In the course of those charges you can certainly emphasize them reaching their own judgement based on the evidence in this case before them and without in any[]way alluding to what happened during voir dire.

The name Eddie M[o]lina means nothing at the moment during voir dire to any of these people.  By the time he testifies, even those who heard the comment, will probably not remember which witness it was about whom that comment was made, much less what the juror said about that person, because you indicated that the names they heard were not necessarily people who might be testifying.

It is not even clear that it will be a salient issue at all, but you can certainly address it by including a curative instruction not focused specifically on what happened during voir dire, but by just emphasizing credibility is to be based on what they see in the courtroom on the witness stand.

THE COURT:  All right, counsel, we will see you at 2:45.

(VD 556-59.)

**The Trial**[5/]

The murders of two people and serious injury of two others took place on October 13,

1999, during an attempted robbery at the Connecticut Muffin store, 10 Prince Street between

Elizabeth Street and the Bowery in Manhattan.  (See Dkt. No. 8: A.D.A. Rosen Aff. ¶ 4; Dkt. No.

---

[5/]     Wells' habeas petition raises issues only about jury selection, not the trial. The Court has not been provided a copy of the trial transcript, and relies on the parties' briefs for this section of the Report and Recommendation, with the parties consent:  "[P]etitioner and respondent have agreed for this case to proceed on the record as submitted by the Petitioner . . . [because t]he original minutes of the trial have been lost, despite the respondent's diligent attempts at locating said minutes."  (Dkt. No. 11: 12/20/07 Joint Ltr. to Court at 1.)

8: Gov't Br. at 2, 4-5; Dkt. No. 3: Wells Br. at 2.)  At approximately 5:00 p.m., Wells and an

accomplice entered Connecticut Muffin wearing hats, wigs and matching athletic suits, and shot and

killed Cary Crissey, an owner of Connecticut Muffin, and employee Jimmy Brown.  (See A.D.A.

Rosen Aff. ¶ 4; Gov't Br. at 2, 6-7, 18-20; Wells Br. at 2.)  They also shot and severely wounded

customer Marcos Pesantez and cashier Joseph Bocangera.  (See A.D.A. Rosen Aff. ¶ 4; Gov't Br.

at 2, 20; Wells Br. at 2.)

      Several witnesses testified that they noticed two men in matching clothes standing

and walking in the area shortly before 5:00 p.m. and then enter the store.  (See Gov't Br. at 6-8.)

Pesantez testified that he stood facing Wells and saw virtually all of his face when Wells came to

the doorway of the back office.  (See Gov't Br. at 8.)  Pesantez testified that Wells had a black gun

in his hand and that Wells fired the shots at Pesantez, Crissey and Brown.  (See A.D.A. Rosen Aff.

¶ 4; Gov't Br. at 2, 8-9.)  After the shootings, Wells and his accomplice ran from the store without

taking any money.  (See A.D.A. Rosen Aff. ¶ 5; Gov't Br. at 2, 9.)  The same witnesses who saw

Wells and his accomplice enter the store heard the gunshots and saw the two identically clad men

flee.  (See Gov't Br. at 9-10.)  Some of the witnesses also saw a black gun in Wells' hand.  (See Gov't

Br. at 10.)

      Det. Eddie Molina and a second undercover officer were standing on a nearby corner

during an unrelated narcotics operation when Wells and his accomplice ran out of the store, towards

them.  (See A.D.A. Rosen Aff. ¶ 5; Gov't Br. at 2, 12-13; Wells Br. at 2, 7.)  When the police ordered

Wells and his accomplice to stop, Wells and his accomplice each fired two shots in the detectives'

direction.  (See A.D.A. Rosen Aff. ¶ 5; Gov't Br. at 2, 13-14; Wells Br. at 8.)  Det. Molina saw Wells

remove clothing and drop a gun.  (See Gov't Br. at 14; Wells Br. at 8.)  Det. Molina and the other

officer pursued Wells and his accomplice, apprehended Wells' accomplice, and saw other officers

arrest Wells.  (See A.D.A. Rosen Aff. ¶ 5; Gov't Br. at 2, 14-16; Wells Br. at 2, 8.)

       The police retrieved a wig and black Lorcin .380 semiautomatic gun with an empty

magazine that had been dropped on the street.  (See Gov't Br. at 14-15.)  When he was arrested,

Wells had a Lorcin .380 ammunition magazine in his pants pocket.  (See Gov't Br. at 16.)  Ballistics

evidence showed that the fatal wounds to Crissey and Brown were caused by .380 caliber bullets

fired from Wells' Lorcin gun.  (See A.D.A. Rosen Aff. ¶ 4; Gov't Br. at 2, 19-20.)

       Wells did not testify at trial.  (Dkt. No. 2: Pet. ¶ 8.)

## Verdict and Sentence

       The jury convicted Wells of four counts of first degree murder, two counts of first

degree attempted murder, four counts of second degree murder, one count of second degree

attempted murder, two counts of first degree assault, one count of second degree assault, two counts

of second degree possession of a weapon, and one count of second degree burglary. (Dkt. No. 2: Pet.

Ex. B: Verdict Tr. 2820.)

       Wells was sentenced to twenty five  years to life imprisonment for the counts related

to Crissey's murder and an additional, consecutive twenty five years to life for the counts related to

Brown's murder.  (Pet. Ex. C: S. 41.)  Wells was sentenced to additional imprisonment terms for the

other counts, all to run concurrently with the murder sentences.  (S. 41-42.)

**Wells' Direct Appeal**

In March 2004, represented by new counsel (the Office of the Appellate Defender), Wells appealed to the First Department, claiming, <u>inter alia</u>, that: (1) "where the prosecution's proffered reason for exercising a peremptory challenge against a female African American prospective juror was that the juror reminded the prosecutor of a female African-American judge, . . . the court erred in denying Terence Wells's <u>Batson</u> challenge." (Dkt. No. 2: Pet. Ex. D(1): Wells 1st Dep't Br. at 21-38; <u>see also</u> Pet. Ex. D(3): Wells 1st Dep't Reply Br. at 3-15); and (2) "the trial court abused its discretion in refusing to strike the newly-seated jury panel after a venire person tainted the venire by bearing witness to the honesty of the prosecution's most crucial police witness, Detective Eddie Molina" (Wells 1st Dep't Br. at 39-48; <u>see also</u> Wells 1st Dep't Reply Br. at 16-20).

On January 4, 2005, the First Department unanimously affirmed Wells' conviction, holding in relevant part:

> The court properly denied defendant's application pursuant to <u>Batson</u> v. <u>Kentucky</u>. After the prosecution explained its reasons for the three challenges at issue, defense counsel remained silent when the court accepted the reasons as nonpretextual, and there is no indication that the court prevented counsel from making the necessary record. Thus, defendant failed to preserve his current claims for appellate review, and we decline to review them in the interest of justice. Were we to review defendant's claims, we would find that the record supports the court's findings that the nondiscriminatory reasons provided by the prosecutor for the challenges in question were not pretextual. The trial court's determinations in this regard are entitled to great deference, particularly where the explanations involved matters of demeanor, which the court had the unique opportunity to observe. We also reject defendant's claim that, as to one panelist, the prosecutor did not even meet its step-two burden of coming forward with a race-neutral explanation. The prosecutor's disparaging comparison of the panelist to a named individual, while in poor taste, clearly referred to matters of personality and demeanor, but not race.

The court properly denied defendant's motion to dismiss an entire panel of prospective jurors based on a remark by a discharged venire person concerning his acquaintance with one of the police witnesses. Any possible prejudice to defendant was obviated by the court's instructions to the panel. Furthermore, this witness's testimony was only one of the many components of the extensive evidence of defendant's guilt, and there is no reasonable possibility that the panelist's brief remark affected the verdict.

People v. Wells, 14 A.D.3d 320, 321, 787 N.Y.S.2d 45, 47 (1st Dep't 2005) (citations omitted).

On May 11, 2006, the New York Court of Appeals unanimously affirmed Wells' conviction. As to the Batson issue, the New York Court of Appeals held:

Defendant also maintains that he is entitled to a new trial because the prosecutor impermissibly used a peremptory challenge against a female African-American prospective juror in violation of Batson v. Kentucky. Defense counsel raised a Batson challenge during the second round of jury selection. When asked by the trial court to provide race-neutral reasons for the removal of this woman, the prosecutor stated that the prospective juror had held her hand over her mouth when answering questions, which indicated to the prosecutor that the juror had "something to hide." The prosecutor also claimed that the juror had "an unsettling gaze" that was "difficult to deal with," and remarked that the juror reminded her of a particular New York City judge. In addition, the prosecutor noted that the juror liked to read detective stories and "might have [an] expectation of what should be part of a case." Defendant did not claim that the prosecutor's reasons were pretextual. The trial court found the justifications for the peremptory challenge to be nondiscriminatory and denied defendant's Batson application.

"[I]n order to establish a prima facie case of discrimination in the selection of jurors under Batson, a defendant asserting a claim must show that the exercise of peremptory challenges by the prosecution removes one or more members of a cognizable racial group from the venire and that facts and other relevant circumstances support a finding that the use of these peremptory challenges excludes potential jurors because of their race".

Once these showings are made, the burden then shifts to the People to respond with a race-neutral explanation for the peremptory challenge. "If a race-neutral explanation is tendered, the trial court must then decide . . . whether the

opponent of the strike has proved purposeful racial discrimination" or whether the reasons proffered by the prosecution were pretextual.

       We conclude that the record supports the trial court's determination that the prosecutor's justifications were race-neutral. The prosecutor's reasons for exercising the peremptory challenge focused on the juror's demeanor (placing her hand over her mouth and having an "unsettling gaze") and fondness for detective stories (which might cause her to have certain expectations about the trial evidence). Furthermore, the prosecutor's reference to a particular judge, although in "poor taste" as noted by the Appellate Division, was not facially race-based (see Purkett v. Elem, 514 U.S. [765,] 768, [115 S. Ct. 1769, 1771 (1995)] ("Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral" (internal quotation marks omitted))).FN3  Because the People's burden "is met by offering any facially neutral reason for the challenge -- even if that reason is ill-founded -- so long as the reason does not violate equal protection", and the trial court's findings are entitled to deference, we cannot say that the prosecutor's justifications for the use of the peremptory challenge were inadequate.

           FN3. Although it may be possible that an unexplained comparison of a prospective juror to a specific person could carry an inference of discriminatory intent, if defendant believed that the oblique reference in this case had improper racial overtones that were not facially apparent, defense counsel should have made an adequate record to allow that claim to be considered by the trial court and reviewed on appeal.

People v. Wells, 7 N.Y.3d 51, 57-59, 817 N.Y.S.2d 590, 594-95 (2006) (citations omitted). The

Court of Appeals also rejected Wells' challenge to the trial court's determination not to discharge a

venire panel, holding:

       Finally, defendant contends that the trial court erred in refusing to discharge an entire panel of prospective jurors after a comment about a possible witness was made by one member of the array. During the fourth round of jury selection and after 10 individuals had been sworn as jurors, the trial court read a list of potential witnesses to a panel of 27 prospective jurors, asking if they were familiar with any of those individuals. One individual replied that he was "good friends" with a detective whose name was on the list. When asked if this friendship would affect his ability to be fair and impartial, the prospective juror replied, "I think he's an honest guy so I would tend to be swayed by what he says."

The trial court promptly discharged that prospective juror for cause. Defendant, however, asked that all 26 other members of the panel also be removed because the detective was an important witness and they had heard the remark. The trial court denied defendant's request but later questioned the prospective jurors collectively to determine whether they had been influenced by comments made by any other prospective juror.

When instructing the panel on general principles regarding the trial, the court stated that "[e]ach witness's testimony must be weighed upon its own merits" and asked "[i]f anyone thinks he or she may have feelings favorable or unfavorable for any witness you are bound by your oath to say that. Does anyone have an affirmative answer to that one?" Two persons expressed concerns about their ability to be fair and were excused by the court. The court then inquired if anyone had "any feeling about the police or have had experiences which would lead you to give a police officer's testimony any greater or lessor [sic] weight than anyone else's testimony?" None of the prospective jurors indicated that they were incapable of impartially judging a police officer's veracity. The next question to the panel was: "is there anything about any answers to any questions or any statements made by any other prospective juror that any of you feel might affect your ability to be fair and impartial in this case?" No one offered an affirmative reply to this question.

Based on the content of the prospective juror's statement, in conjunction with the court's inquiries and the responses thereto, there was no legal basis to dismiss the panel for cause. The removed juror's remark did not create a likelihood of substantial prejudice because it did not relate to defendant's guilt, refer to his reputation in the community, or provide an expert-like opinion regarding the likelihood that he had been falsely accused -- statements which may, depending on the circumstances, warrant additional remedial action by a trial court. Furthermore, none of the prospective jurors indicated that the comment about the detective would affect his or her ability to be fair and impartial or would cause any of them to give a police officer's testimony more weight than other witnesses. We therefore conclude that there was no abuse of discretion by the court in declining to excuse the panel.

Accordingly, the order of the Appellate Division should be affirmed.

People v. Wells, 7 N.Y.3d at 59-60, 817 N.Y.S.2d at 596 (citations omitted).

19

Judge George Bundy Smith joined the majority opinion and also wrote a concurring opinion on the <u>Batson</u> issue, stating:

I agree with the Court's conclusion that the order appealed from should be affirmed. After the prosecution set out its reasons for the peremptory strike of a female African-American prospective juror, defendant did not say anything further about her or make an attempt to seek clarification of the prosecution's ambiguous explanation comparing her to a former state Supreme Court justice. Thus, defendant did not make the specific and timely objections necessary to: (1) apprise the court of the ambiguities inherent in this explanation and of his opposing arguments; and (2) give the court the opportunity to take any necessary remedial action. Thus, by failing to make an objection that the reason proffered by the prosecution was not clearly race/gender-neutral, defendant failed to preserve this argument for appellate review.

It should be emphasized, however, that after a defendant makes out a prima facie case of discrimination in the selection of jurors under <u>Batson</u>, the prosecution's explanation for the peremptory challenge must be unequivocally race/gender-neutral and related to the particular case to be tried. These requirements must be adhered to even where the prosecution gives an explanation that is not clearly race/gender-neutral among explanations that are facially race/gender-neutral.

Here, the Appellate Division concluded that the prosecution met its step two burden of putting forth a race-neutral explanation based on its ruling that "[t]he prosecutor's disparaging comparison of the panelist to a named individual . . . clearly referred to matters of personality and demeanor, but not race."FN2 This Court concluded "that the record supports the trial court's determination that the prosecutor's justifications were race-neutral" and further ruled that: (1) the prosecutor's reasons for exercising the peremptory challenge focused on the prospective juror's demeanor; and (2) the "reference to a particular judge, although in 'poor taste' . . . , was not facially race-based." Because one of the prosecutor's reasons for exercising a peremptory strike against this prospective juror was not unequivocally race/gender-neutral, I disagree with the above-mentioned conclusions reached by this Court and the Appellate Division.

FN2. At "step two": (1) the explanation proffered by the prosecution need not be persuasive or plausible; and (2) "'the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'"

I do not agree with the position that "any" facially neutral explanation, no matter how implausible or ridiculous, as long as it comports with the strictures of equal protection, can rebut a defendant's prima facie case of race- or gender-based discrimination in jury selection. Under this formulation, there would be an inequity in terms of the burdens to be met by the opponent and proponent of the strike, i.e., the opponent of the strike has to establish a pattern of discrimination, or other discriminatory factors, while the proponent could meet its burden by putting forth rote, facially neutral explanations. Moreover, there is a potential for the trivialization of the voir dire process based on the types of explanations that can be advanced by the proponent of a strike.  Specifically, since the improper use of peremptory challenges involves rights of a constitutional dimension, the proffered explanations, which essentially argue that the use of such challenges was proper, should reflect the seriousness of the rights involved.  In my view, facially neutral explanations should at least be reasonable and, in accordance with Batson, related to the trial at hand.  Whether the proffered explanation is reasonable does not go to the court's step three analysis.  A "reasonable explanation" requirement would merely ensure that the explanations make sense under the circumstances.

As noted in the Court's opinion, the prosecution cited a number of explanations in support of the peremptory challenge at issue.  The explanations are set forth in the following colloquy:

"[PROSECUTOR]:  [The prospective juror] answered questions with her hand over her face, her hand over her mouth.  That's something I'm very sensitive to.  In my preparation of witnesses, [ ] part of what I tell people when I prepare them to testify [is] when someone is on the stand and talks with her hand over their mouth[,] to people it signifies as a matter of body language something to hide.

"In addition she has sort of an unsettling gaze that I just found difficult to deal with and additionally *she also reminded me, I have to say of [a named Supreme Court justice] which made me just somewhat anxious in a sort of an emotional way.*  So those were my concerns plus she reads she indicated affirmatively she read[s] detective stories, someone like that I think notwithstanding what she said might have expectation of what should be part of a case.

"THE COURT:  I find that to be nondiscriminatory." (Emphasis added.)

The prosecutor's statement regarding how the prospective juror reminded her of a named Supreme Court justice, who is also an African-American woman, and how this made the prosecutor "anxious in a sort of [ ] emotional way," raised issues that should have been pursued during the voir dire.  Not only is this statement insulting and irrational, it is wholly ambiguous.  The proffered reason, on its face, is not clearly race/gender-neutral.  Nor is it clearly race/gender-based, i.e., there is no indication from the prosecutor's explanation as to what about the prospective juror reminded the prosecutor of the named Supreme Court justice (e.g., the prosecutor did not mention that the demeanor of the prospective juror was similar to that of the named African-American woman).  Nor is it clear from the explanation how the prospective juror made the prosecutor "anxious in a sort of [ ] emotional way."FN3  Moreover, the prosecution's explanation, on its face, was not related to the instant matter.

> FN3.  As noted above, "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."  Moreover, this Court's conclusion that the prosecution's explanation was race-neutral was based, in part, on its statement that the explanation "was not facially race-based."    These principles should only apply when a race/gender-neutral (or race/gender-based) explanation has been clearly set forth.  However, in the instant case, where the prosecutor has put forth an explanation:  (1) that is not clearly race/gender-neutral; (2) from which no clear intent of purpose (discriminatory or nondiscriminatory) can be gleaned; and (3) which is not discriminatory on its face, applying these principles necessarily leads to an erroneous result, i.e., a court would be required to find a race/gender-neutral explanation even where one was not clearly present.

> Based on the foregoing, the trial court, before accepting this explanation as race/gender-neutral (and certainly before its ruling that the explanation was nondiscriminatory), should have conducted an inquiry (or directed that defendant conduct an inquiry) to clarify the prosecution's ambiguous explanation.  Because no such inquiry occurred here, no further explanation of the statement at issue was provided by the prosecution.  Without clarification, this statement is not clearly race/gender-neutral.  Because all of the explanations for the prosecution's strike of the prospective juror were not clearly race/gender-neutral, the trial court should have ruled that the prosecution did not meet its step two obligation under Batson.

People v. Wells, 7 N.Y.3d at 60-64, 817 N.Y.S.2d at 596-99 (G.B. Smith, concurring) (citations & fn. omitted, quotation alterations & emphasis in original).

22

**Wells' Federal Habeas Corpus Petition**

Wells' counseled habeas corpus petition asserts that: (1) "[t]he trial court violated the Equal Protection Clause of the United States Constitution by denying Mr. Wells's Batson challenge when the prosecutor's reason for using a peremptory strike [against one potential juror, Ms. Brown] was discriminatory on its face, [thus] forcing Mr. Wells to be tried before a jury selected with race-based discrimination" (Dkt. No. 2: Pet. ¶ 15; see also Dkt. No. 3: Wells Br. at 20-25; Dkt. No. 10: Wells Reply Br. at 1-7); and (2) "Mr. Wells's Sixth Amendment right to be tried before a fair and impartial jury was violated by the trial court's refusal to strike a newly-seated jury panel after a prospective juror attested to the credibility of a key prosecution witness before the panel, from which jurors and alternates were ultimately chosen" (Pet. ¶ 21; see also Wells Br. at 26-32; Wells Reply Br. at 7-12).

## ANALYSIS

## I.    THE AEDPA REVIEW STANDARD[6/]

---

[6/]    For additional decisions by this Judge discussing the AEDPA review standard in language substantially similar to that in this entire section of this Report & Recommendation, see, e.g., Ocasio v. Smith, 07 Civ. 2754, 2008 WL 110938 at *6-10 (S.D.N.Y. Jan. 8, 2008) (Peck, M.J.); Rivera v. Ercole, 07 Civ. 3577, 2007 WL 2706274 at *7-10 (S.D.N.Y. Sept. 18, 2007) (Peck, M.J.) (citing my prior decisions); Morales v. Artus, 05 Civ. 3542, 2006 WL 3821488 at *13-16 (S.D.N.Y. Dec. 28, 2006) (Peck, M.J.) (citing my prior decisions); Bryant v. Fischer, 05 Civ. 0437, 2005 WL 3418282 at *10-14 (S.D.N.Y. Dec. 14, 2005) (Peck, M.J.); Olivo v. Thorton, 05 Civ. 3237, 2005 WL 3292542 at *5-8 (S.D.N.Y. Dec. 6, 2005) (Peck, M.J.) (citing my prior decisions), report & rec. adopted, 2006 WL 1636742 (S.D.N.Y. June 12, 2006) & 2006 WL 2689889 (S.D.N.Y. Sept. 19, 2006); Boyd v. Smith, 03 Civ. 5401, 2004 WL 2915243 at *5-7 (S.D.N.Y. Dec. 17, 2004) (Peck, M.J.) (citing my prior decisions); Montalvo v. Annetts, 02 Civ. 1056, 2003 WL 22962504 at *12-14 (S.D.N.Y. (continued...)

23

Before the Court can determine whether petitioner is entitled to federal habeas relief, the Court must address the proper habeas corpus review standard under the Antiterrorism and Effective Death Penalty Act ("AEDPA").

In enacting the AEDPA, Congress significantly "modifie[d] the role of federal habeas courts in reviewing petitions filed by state prisoners." Williams v. Taylor, 529 U.S. 362, 403, 120 S. Ct. 1495, 1518 (2000). The AEDPA imposed a more stringent review standard, as follows:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).[7]

---

[6]    (...continued)
Dec. 17, 2003) (Peck, M.J.) (citing my prior decisions); Larrea v. Bennett, 01 Civ. 5813, 2002 WL 1173564 at *14 (S.D.N.Y. May 31, 2002) (Peck, M.J.), report & rec. adopted, 2002 WL 1808211 (S.D.N.Y. Aug. 6, 2002), aff'd, 368 F.3d 179 (2d Cir. 2004); Mendez v. Artuz, 98 Civ. 2652, 2000 WL 722613 at *22 (S.D.N.Y. June 6, 2000) (Peck, M.J.), report & rec. adopted, 2000 WL 1154320 (S.D.N.Y. Aug. 14, 2000), aff'd, 303 F.3d 411, 417 (2d Cir. 2002), cert. denied, 537 U.S. 1245, 123 S. Ct. 1353 (2003); Fluellen v. Walker, 97 Civ. 3189, 2000 WL 684275 at *10 (S.D.N.Y. May 25, 2000) (Peck, M.J.), aff'd, 41 Fed. Appx. 497 (2d Cir. 2002), cert. denied, 538 U.S. 978, 123 S. Ct. 1787 (2003).

[7]    See also, e.g., Henry v. Poole, 409 F.3d 48, 67 (2d Cir. 2005), cert. denied, 547 U.S. 1040, 126 S. Ct. 1622 (2006); Howard v. Walker, 406 F.3d 114, 121-22 (2d Cir. 2005); Cox v.
(continued...)

24

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have "independent meaning." Williams v. Taylor, 529 U.S. at 404-05, 120 S. Ct. at 1519.[8/]  Both, however, "restrict[] the source of clearly established law to [the Supreme] Court's jurisprudence." Williams v. Taylor, 529 U.S. at 412, 120 S. Ct. at 1523.[9/]  "That federal law, as defined by the

---

[7/]   (...continued)
Donnelly, 387 F.3d 193, 197 (2d Cir. 2004); Dallio v. Spitzer, 343 F.3d 553, 559-60 (2d Cir. 2003), cert. denied, 541 U.S. 961, 124 S. Ct. 1713 (2004); Eze v. Senkowski, 321 F.3d 110, 120 (2d Cir. 2003) ("AEDPA changed the landscape of federal habeas corpus review by 'significantly curtail[ing] the power of federal courts to grant the habeas petitions of state prisoners.'") (quoting Lainfiesta v. Artuz, 253 F.3d 151, 155 (2d Cir. 2001), cert. denied, 535 U.S. 1019, 122 S. Ct. 1611 (2002)).

[8/]   Accord, e.g., Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir.), cert. denied, 540 U.S. 1091, 124 S. Ct. 962 (2003); Jones v. Stinson, 229 F.3d 112, 119 (2d Cir. 2000); Lurie v. Wittner, 228 F.3d 113, 125 (2d Cir. 2000), cert. denied, 532 U.S. 943, 121 S. Ct. 1404 (2001); Clark v. Stinson, 214 F.3d 315, 320 (2d Cir. 2000), cert. denied, 531 U.S. 1116, 121 S. Ct. 865 (2001).

[9/]   Accord, e.g., Carey v. Musladin, 127 S. Ct. 649, 654 (2006) ("Given the lack of holdings from the Court regarding this [issue], it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"); Yarborough v. Alvarado, 541 U.S. 652, 659, 124 S. Ct. 2140, 2147 (2004) ("We look for 'the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision.'"); Wiggins v. Smith, 539 U.S. 510, 519, 123 S. Ct. 2527, 2534 (2003); Lockyer v. Andrade, 538 U.S. 63, 72, 123 S. Ct. 1166, 1172 (2003) ("Section 2254(d)(1)'s 'clearly established' phrase 'refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision.'"); Rodriguez v. Miller, 499 F.3d 136, 140 (2d Cir. 2007) ("'Clearly established federal law' refers only to the holdings of the Supreme Court. No principle of constitutional law grounded solely in the holdings of the various courts of appeals or even in the dicta of the Supreme Court can provide the basis for habeas relief. Leading by example, Musladin admonishes courts to read the Supreme Court's holdings narrowly and to disregard as dicta for habeas purposes much of the underlying logic and rationale of the high court's decisions.") (citations & fn. omitted); Howard v. Walker, 406 F.3d 122; Tueros v. Greiner, 343 F.3d 587, 591 (2d Cir. 2003), cert. denied, 541 U.S.
(continued...)

Supreme Court, may be either a generalized standard enunciated in the [Supreme] Court's case law or a bright-line rule designed to effectuate such a standard in a particular context." Kennaugh v. Miller, 289 F.3d at 42. "A petitioner can not win habeas relief solely by demonstrating that the state court unreasonably applied Second Circuit precedent." Yung v. Walker, 341 F.3d at 110; accord, e.g., Rodriguez v. Miller, 499 F.3d at 140; DelValle v. Armstrong, 306 F.3d at 1200.

> As to the "contrary to" clause:
>
> A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases. . . .  A state-court decision will also be contrary to [the Supreme] Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.

Williams v. Taylor, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.[10/]

---

[9/]     (...continued)
1047, 124 S. Ct. 2171 (2004); Parsad v. Greiner, 337 F.3d at 181; DelValle v. Armstrong, 306 F.3d 1197, 1200 (2d Cir. 2002); Yung v. Walker, 341 F.3d 104, 109-110 (2d Cir. 2003); Kennaugh v. Miller, 289 F.3d 36, 42 (2d Cir.), cert. denied, 537 U.S. 909, 123 S. Ct. 251 (2002); Loliscio v. Goord, 263 F.3d 178, 184 (2d Cir. 2001); Sellan v. Kuhlman, 261 F.3d 303, 309 (2d Cir. 2001).

[10/]    Accord, e.g., Brown v. Payton, 544 U.S. 133, 125 S. Ct. 1432, 1438-39 (2005); Bell v. Cone, 543 U.S. 447, 452-53, 125 S. Ct. 847, 851 (2005); Price v. Vincent, 538 U.S. 634, 640, 123 S. Ct. 1848, 1853 (2003); Lockyer v. Andrade, 123 S. Ct. at 1173-74; Hawkins v. Costello, 460 F.3d 238, 242 (2d Cir. 2006), cert. denied, 127 S. Ct. 1267 (2007); Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 210, 219 (2d Cir.), cert. denied, 546 U.S. 889, 126 S. Ct. 215 (2005); Tueros v. Greiner, 343 F.3d at 591; DelValle v. Armstrong, 306 F.3d at 1200; Yung v. Walker, 341 F.3d at 109; Kennaugh v. Miller, 289 F.3d at 42; Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d at 127-28.

In <u>Williams</u>, the Supreme Court explained that "[u]nder the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 413, 120 S. Ct. at 1523.[11/] However, "[t]he term 'unreasonable' is . . . difficult to define." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 410, 120 S. Ct. at 1522. The Supreme Court made clear that "an <u>unreasonable</u> application of federal law is different from an <u>incorrect</u> application of federal law." <u>Id</u>.[12/] Rather, the issue is "whether the state court's application of clearly established federal law was objectively unreasonable." <u>Williams</u> v. <u>Taylor</u>, 529 U.S. at 409, 120 S. Ct. at 1521.[13/] "Objectively unreasonable" is different from "clear error."

---

[11/]    Accord, <u>e.g.</u>, <u>Brown</u> v. <u>Payton</u>, 544 U.S. at 141, 125 S. Ct. at 1439; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2534-35; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d 238, 246 (2d Cir. 2006), <u>cert. denied</u>, 127 S. Ct. 1383 (2007); <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Parsad</u> v. <u>Greiner</u>, 337 F.3d at 181.

[12/]    See also, <u>e.g.</u>, <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. at 1853 ("As we have explained:  '[A] federal habeas court may not issue the writ simply because that court concludes the state-court decision applied [a Supreme Court case] incorrectly.'") (quoting <u>Woodford</u> v. <u>Visciotti</u>, 537 U.S. 19, 24-25, 123 S. Ct. 357, 360 (2002)); <u>Lockyer</u> v. <u>Andrade</u>, 538 U.S. at 75, 123 S. Ct. at 1175; <u>Hawkins</u> v. <u>Costello</u>, 460 F.3d at 243; <u>Lynn</u> v. <u>Bliden</u>, 443 F.3d at 246; <u>Henry</u> v. <u>Poole</u>, 409 F.3d at 68; <u>Howard</u> v. <u>Walker</u>, 406 F.3d at 122; <u>Rosa</u> v. <u>McCray</u>, 396 F.3d at 219; <u>Cox</u> v. <u>Donnelly</u>, 387 F.3d at 197; <u>Eze</u> v. <u>Senkowski</u>, 321 F.3d at 124-25; <u>DelValle</u> v. <u>Armstrong</u>, 306 F.3d at 1200 ("With regard to issues of law, therefore, if the state court's decision was not an unreasonable application of, or contrary to, clearly established federal law as defined by Section 2254(d), we may not grant habeas relief even if in our judgment its application was erroneous.").

[13/]    Accord, <u>e.g.</u>, <u>Yarborough</u> v. <u>Alvarado</u>, 541 U.S. at 664, 124 S. Ct. at 2150; <u>Wiggins</u> v. <u>Smith</u>, 539 U.S. at 520-21, 123 S. Ct. at 2535; <u>Price</u> v. <u>Vincent</u>, 538 U.S. at 641, 123 S. Ct. (continued...)

Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1175 ("The gloss of clear error fails to give proper

deference to state courts by conflating error (even clear error) with unreasonableness.").  However,

the Second Circuit has explained "that while '[s]ome increment of incorrectness beyond error is

required . . . the increment need not be great; otherwise, habeas relief would be limited to state court

decisions so far off the mark as to suggest judicial incompetence.'" Jones v. Stinson, 229 F.3d at 119

(quoting Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000)).[14/]  "[T]he range of reasonable

judgment can depend in part on the nature of the relevant rule." Yarborough v. Alvarado, 541 U.S.

at 663, 124 S. Ct. at 2149.[15/]  "Even if the state court issues a decision 'contrary to' clearly established

---

[13/]    (...continued)
at 1853; Lockyer v. Andrade, 538 U.S. at 75, 123 S. Ct. at 1174-75; Woodford v. Visciotti,
537 U.S. at 25-27, 123 S. Ct. at 360-61; Mosby v. Senkowski, 470 F.3d 515, 519 (2d Cir.
2006), cert. denied, 128 S. Ct. 75 (2007); Hawkins v. Costello, 460 F.3d at 243; Lynn v.
Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v. Walker, 406 F.3d at 122;
Cox v. Donnelly, 387 F.3d at 197; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303
F.3d 231, 245 (2d Cir. 2002); Loliscio v. Goord, 263 F.3d at 184; Lurie v. Wittner, 228 F.3d
at 128-29.

[14/]    Accord, e.g., Lynn v. Bliden, 443 F.3d at 246; Henry v. Poole, 409 F.3d at 68; Howard v.
Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d at 219; Cox v. Donnelly, 387 F.3d at
197, 200-01; Eze v. Senkowski, 321 F.3d at 125; Ryan v. Miller, 303 F.3d at 245; Yung v.
Walker, 341 F.3d at 110; Loliscio v. Goord, 263 F.3d at 184.

[15/]    The Supreme Court explained:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant
> rule.  If a legal rule is specific, the range may be narrow.  Applications of the rule
> may be plainly correct or incorrect.  Other rules are more general, and their meaning
> must emerge in application over the course of time.  Applying a general standard to
> a specific case can demand a substantial element of judgment.  As a result, evaluating
> whether a rule application was unreasonable requires considering the rule's
> (continued...)

February 25, 2008 Supreme Court law, . . . a petitioner 'cannot obtain relief . . . unless application of a *correct* interpretation of that [Supreme Court] decision leads to the conclusion that his rights were violated.'" Cousin v. Bennett, 511 F.3d 334, 339 (2d Cir. 2008).

  Moreover, the Second Circuit has held "that a state court determination is reviewable under AEDPA if the state decision unreasonably failed to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." Kennaugh v. Miller, 289 F.3d at 45.[16/]

  Under the AEDPA, in short, the federal courts "must give the state court's adjudication a high degree of deference." Yung v. Walker, 341 F.3d at 109; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853; Mosby v. Senkowski, 470 F.3d at 519.

---

[15/] (...continued)
    specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

   Yarborough v. Alvarado, 541 U.S. at 663, 124 S. Ct. at 2149; accord, e.g., Rodriguez v. Miller, 499 F.3d at 143; Hawkins v. Costello, 460 F.3d at 243.

[16/] Accord, e.g., Tueros v. Greiner, 343 F.3d at 591; Yung v. Walker, 341 F.3d at 109; see Yarborough v. Alvarado, 541 U.S. at 665-66, 124 S. Ct. at 2150-51 ("The petitioner contends that if a habeas court must extend a rationale before it can apply to the facts at hand then the rationale cannot be clearly established at the time of the state-court decision. There is force to this argument. Section 2254(d)(1) would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law. At the same time, the difference between applying a rule and extending it is not always clear. Certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.") (citations omitted).

Even where the state court decision does not specifically refer to either the federal claim or to relevant federal case law, the deferential AEDPA review standard applies:

> For the purposes of AEDPA deference, a state court "adjudicate[s]" a state prisoner's federal claim on the merits when it (1) disposes of the claim "on the merits," and (2) reduces its disposition to judgment.  When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim – even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.

Sellan v. Kuhlman, 261 F.3d at 312; accord, e.g., Bell v. Cone, 543 U.S. at 455, 125 S. Ct. at 853 ("Federal courts are not free to presume that a state court did not comply with constitutional dictates on the basis of nothing more than a lack of citation."); Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365 (2002) (State court not required to cite Supreme Court cases, or even be aware of them, to be entitled to AEDPA deference, "so long as neither the reasoning nor the result of the state-court decision contradicts them."); Mosby v. Senkowski, 470 F.3d at 519; Hawkins v. Costello, 460 F.3d at 243; Lynn v. Bliden, 443 F.3d at 246; Howard v. Walker, 406 F.3d at 122; Rosa v. McCray, 396 F.3d 220; Wade v. Herbert, 391 F.3d 135, 140 (2d Cir. 2004) (Appellate Division held claim was "'without merit.'"  "Such a summary determination, even absent citation of federal case law, is a determination 'on the merits' and as such requires the deference specified by § 2254."  Moreover, "[I]f any reasonable ground was available [for the state court's decision], we must assume the [state] court relied on it."); Francolino v. Kuhlman, 365 F.3d 137, 141 (2d Cir.) (Where "the Appellate Division concluded its opinion by stating that it had 'considered and rejected defendants' remaining claims,'" AEDPA deference applies.), cert. denied, 543 U.S. 872, 125 S. Ct. 110 (2004); Jenkins v. Artuz, 294 F.3d 284, 291 (2d Cir. 2002) ("In Sellan, we found that an even more concise Appellate

Division disposition – the word 'denied' – triggered AEDPA deference."); but cf. Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (A "contrary-to-fact construction is not the same as an alternative holding. . . . We decline to read a contingent observation as an 'adjudication on the merits.'" De novo review applies in such a case.).

Where the state court decision is not clear as to whether it rests on federal law or state procedural law, the Second Circuit in Jimenez v. Walker, 458 F.3d 130, 145-46 (2d Cir. 2006), cert. denied, 127 S. Ct. 976 (2007), instructed that the court must "examine the three clues laid out in Coleman, Quirama and Sellan" – that is, "(1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances." Jimenez v. Walker, 458 F.3d at 145 & n.16; accord, e.g., Clark v. Perez, 510 F.3d 382, 394 (2d Cir. 2008). Using these three factors, the court should

classify the decision as either:

(1)    fairly appearing to rest primarily on federal law or to be interwoven with federal law or

(2)    fairly appearing to rest primarily on state procedural law.

Absent a clear and express statement of reliance on a state procedural bar, the Harris presumption applies to decisions in the first category and deems them to rest on the merits of the federal claim. Such decisions are not procedurally barred and must be afforded AEDPA deference as adjudications "on the merits" under 28 U.S.C. § 2254(d). The Harris presumption does not apply to decisions in the second category, which show themselves to rest on an independent state procedural bar. Nor does it apply to decisions in the first category which contain a clear statement of reliance on a state procedural bar. No AEDPA deference is due to these decisions, but the state may successfully assert that habeas relief is foreclosed provided that the independent state procedural bar is adequate to support the judgment and that neither cause and prejudice nor a fundamental miscarriage of justice is shown.

>The effect of these rules is to present federal habeas courts with a binary circumstance: we either apply AEDPA deference to review a state court's disposition of a federal claim or refuse to review the claim because of a procedural bar properly raised. The middle ground . . . does not exist.

Jimenez v. Walker, 458 F.3d at 145-46 (citations & fns. omitted); accord, e.g., Hawkins v. Costello, 460 F.3d at 242 ("In Jimenez v. Walker, we recently made clear that when a state court rejects a petitioner's claim as either unpreserved or without merit, the conclusive presumption is that the adjudication rested on the merits."). Of course, "[i]f there is no [state court] adjudication on the merits [and no procedural bar], then the pre-AEDPA, de novo standard of review applies." Cotto v. Herbert, 331 F.3d 217, 230 (2d Cir. 2003); see also Jimenez v. Walker, 458 F.3d at 145 n.17.

Finally, "[i]f [the] court finds that the state court engaged in an unreasonable application of established law, resulting in constitutional error, it must next consider whether such error was harmless." Howard v. Walker, 406 F.3d at 122.

In addition to the standard of review of legal issues, the AEDPA provides a deferential review standard for state court factual determinations: "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); accord, e.g., Lynn v. Bliden, 443 F.3d at 246-47; Rosa v. McCray, 396 F.3d at 220. "The petitioner bears the burden of 'rebutting the presumption of correctness by clear and convincing evidence.'" Parsad v. Greiner, 337 F.3d at 181 (quoting § 2254(e)(1)); accord, e.g., Lynn v. Bliden, 443 F.3d at 246-47.

## II.    THE STATE COURT'S <u>BATSON</u> RULING WAS NOT AN UNREASONABLE APPLICATION OF SUPREME COURT PRECEDENT

### A.    <u>Batson v. Kentucky and Its Progeny</u>[17]/

In <u>Batson</u> v. <u>Kentucky</u>, 476 U.S. 79, 84, 106 S. Ct. 1712, 1716 (1986), the Supreme Court reaffirmed that a state's purposeful exclusion of jurors based on race violates the Equal Protection Clause of the Constitution.[18]/    For AEDPA purposes, "[t]he clearly established Supreme Court precedent applicable in this case is <u>Batson</u> v. <u>Kentucky</u> . . . ."    <u>Overton</u> v. <u>Newton</u>, 295 F.3d 270, 276 (2d Cir. 2002).[19]/

---

[17]/    For additional decisions by this Judge discussing <u>Batson</u> in language substantially similar to that in this entire section of this Report & Recommendation, <u>see</u> <u>Curry</u> v. <u>Burge</u>, 03 Civ. 0901, 2004 WL 2601681 at *32-33 (S.D.N.Y. Nov. 17, 2004) (Peck, M.J.), <u>report & rec. adopted</u>, 2005 WL 106490 (S.D.N.Y. Jan. 19, 2005) & 2007 WL 4098115 (S.D.N.Y. Nov. 16, 2007); <u>Rodriguez</u> v. <u>Senkowski</u>, 03 Civ. 3314, 2004 WL 503451 at *30-31 (S.D.N.Y. March 15, 2004) (Peck, M.J.); <u>Besser</u> v. <u>Walsh</u>, 02 Civ. 6775, 2003 WL 22093477 at *24-26 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.), <u>report & rec. adopted</u>, 2003 WL 22846044 (S.D.N.Y. Dec. 2, 2003); <u>Rodriguez</u> v. <u>Lord</u>, 00 Civ. 0402, 2001 WL 1223864 at *17-18 (S.D.N.Y. Oct. 15, 2001) (Peck, M.J.), <u>report & rec. adopted</u>, 2004 WL 2149116 (S.D.N.Y. Sept. 22, 2004); <u>Owens</u> v. <u>Portuondo</u>, 98 Civ. 6559, 1999 WL 378343 at *10 (S.D.N.Y. June 9, 1999) (Peck, M.J.), <u>aff'd</u>, 205 F.3d 1324 (2d Cir. 2000).

[18]/    The <u>Batson</u> analysis applies to peremptory challenges by a criminal defendant as well as by a prosecutor.    <u>Georgia</u> v. <u>McCollum</u>, 505 U.S. 42, 59, 112 S. Ct. 2348, 2359 (1992); <u>McKinney</u> v. <u>Artuz</u>, 326 F.3d 87, 98 n.12 (2d Cir. 2003); <u>Hayes</u> v. <u>Conway</u>, 05 Civ. 4088, 2007 WL 2265151 at *3 (S.D.N.Y. Aug. 2, 2007); <u>Curry</u> v. <u>Burge</u>, 2004 WL 2601681 at *32; <u>Rodriguez</u> v. <u>Senkowski</u>, 2004 WL 503451 at *30; <u>Besser</u> v. <u>Walsh</u>, 2003 WL 22093477 at *25; <u>Walters</u> v. <u>Mitchell</u>, No. 99-CV-2579, 2002 WL 1751400 at *2 (E.D.N.Y. July 18, 2002).

[19]/    <u>See also</u>, <u>e.g.</u>, <u>Anderson</u> v. <u>Superintendent of the Elmira Corr. Facility</u>, No. 05-1586, 2008 WL 162842 at *2 (2d Cir. Jan. 18, 2008); <u>Cousin</u> v. <u>Bennett</u>, 511 F.3d 334, 339 (2d Cir. 2008); <u>Majid</u> v. <u>Portuondo</u>, 428 F.3d 112, 125 (2d Cir. 2005), <u>cert. denied</u>, 127 S. Ct. 151
(continued...)

As the Second Circuit reiterated, "[t]he Supreme Court has set forth a three-part test trial courts are to employ when evaluating whether a party exercised a peremptory challenge in a discriminatory manner." Galarza v. Keane, 252 F.3d 630, 635 (2d Cir. 2001).  The Second Circuit has summarized that test as follows:

> [Step 1:]  First, a trial court must decide whether the party challenging the strike has made a prima facie showing that the circumstances give rise to an inference that a member of the venire was struck because of his or her race.  Such a prima facie case may be established, for example, by showing a pattern of strikes against minority prospective jurors. . . .

> [Step 2:]  If the party making the Batson challenge establishes a prima facie case, the trial court must require the non-moving party to proffer a race-neutral explanation for striking the potential juror.  The second step does not require the party to give an explanation that is persuasive or even plausible.

> [Step 3:]  Finally, if the non-moving party proffers a race-neutral explanation, the trial court must determine whether the moving party has carried his or her burden of proving that the strike was motivated by purposeful discrimination.

Galarza v. Keane, 252 F.3d at 636 (citations omitted); see, e.g., Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct. 969, 973-74 (2006); Johnson v. California, 545 U.S. 162, 168, 125 S. Ct. 2410, 2416 (2005); Miller-El v. Dretke, 545 U.S. 231, 239, 125 S. Ct. 2317, 2324-25 (2005); Miller-El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 1035 (2003); Batson v. Kentucky, 476 U.S. at 96-98, 106 S. Ct. at 1723-24; Purkett v. Elem, 514 U.S. 765, 767, 115 S. Ct. 1769, 1770-71 (1995); Hernandez v. New York, 500 U.S. 352, 358-59, 111 S. Ct. 1859, 1865-66 (1991); McKinney v. Artuz, 326 F.3d

---

[19] (...continued)
(2006); Delvalle v. Herbert, 129 Fed. Appx. 646, 649 (2d Cir. 2005); Harris v. Kuhlmann, 346 F.3d 330, 342-43 (2d Cir. 2003).

at 97-98; <u>Overton</u> v. <u>Newton</u>, 295 F.3d at 276; <u>Jordan</u> v. <u>Lefevre</u>, 206 F.3d 196, 200 (2d Cir. 2000).[20]

In a footnote in <u>Batson</u>, the Supreme Court emphasized the deference to be accorded to the trial judge's determination: "Since the trial judge's findings in the context under consideration here largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." <u>Batson</u> v. <u>Kentucky</u>, 476 U.S. at 98 n.21, 106 S. Ct. at 1724 n.21; <u>accord</u>, <u>e.g.</u>, <u>Owens</u> v. <u>Portuondo</u>, 1999 WL 378343 at *9.

The Second Circuit has held that a <u>Batson</u> claim "is a structural error that is not subject to harmless error review." <u>Tankleff</u> v. <u>Senkowski</u>, 135 F.3d 235, 248 (2d Cir. 1998); <u>accord</u>, <u>e.g.</u>, <u>Galarza</u> v. <u>Keane</u>, 252 F.3d at 638 n.8.[21]

---

[20] See also, e.g., <u>Cousin</u> v. <u>Bennett</u>, 511 F.3d at 337-38 (reiterates <u>Batson</u> three-steps, and notes that "<u>Batson</u> forbids the exclusion of even one juror on the basis of race. Thus, a 'pattern' of discriminatory exclusions is not required for a prima facie showing . . .") (citations omitted); <u>Richardson</u> v. <u>Greene</u>, 497 F.3d 212, 214 (2d Cir. 2007); <u>Sorto</u> v. <u>Herbert</u>, 497 F.3d 163, 169-70 (2d Cir. 2007); <u>Messiah</u> v. <u>Duncan</u>, 435 F.3d 186, 194-95 (2d Cir. 2006); <u>Majid</u> v. <u>Portuondo</u>, 428 F.3d at 126; <u>Green</u> v. <u>Travis</u>, 414 F.3d 288, 295 n.2 (2d Cir. 2005); <u>Walker</u> v. <u>Girdich</u>, 410 F.3d 120, 123 (2d Cir. 2005); <u>DeBerry</u> v. <u>Portuondo</u>, 403 F.3d 57, 59 (2d Cir.), <u>cert. denied</u>, 546 U.S. 884, 126 S. Ct. 225 (2005); <u>Rodriguez</u> v. <u>Schriver</u>, 392 F.3d 505, 510 n.8 (2d Cir. 2004); <u>United States</u> v. <u>Brown</u>, 352 F.3d 654, 660 (2d Cir. 2003); <u>Harris</u> v. <u>Kuhlmann</u>, 346 F.3d at 343; <u>McKinney</u> v. <u>Artuz</u>, 326 F.3d at 97-98; <u>United States</u> v. <u>Thomas</u>, 320 F.3d 315, 316-17 (2d Cir. 2003); <u>Overton</u> v. <u>Newton</u>, 295 F.3d at 276; <u>Jordan</u> v. <u>Lefevre</u>, 293 F.3d 587, 590 (2d Cir. 2002); <u>United States</u> v. <u>Raysor</u>, 9 Fed. Appx. 33, 34 (2d Cir. 2001), <u>cert. denied</u>, 537 U.S. 922, 123 S. Ct. 314 & 537 U.S. 1012, 123 S. Ct. 482 (2002); <u>Moore</u> v. <u>Walker</u>, No. 99-2754, 234 F.3d 1262 (table), 2000 WL 1721120 at *1 (2d Cir. Nov. 16, 2000).

[21] See, e.g., <u>Isaac</u> v. <u>Greiner</u>, 01 Civ. 2178, 2005 WL 1713036 at *3 n.1 (S.D.N.Y. July 19, 2005), <u>aff'd</u>, 205 Fed. Appx. 873 (2d Cir. 2006); <u>Curry</u> v. <u>Burge</u>, 2004 WL 2601681 at *33;
(continued...)

B.     **Application of Batson to Wells' Habeas Claim**[22]

1.     **Wells' Batson Claim**

---

[21]     (...continued)
Reyes v. Greiner, 340 F. Supp. 2d 245, 263 (E.D.N.Y. 2004), aff'd, 150 Fed. Appx. 77 (2d Cir. 2005), cert. denied, 546 U.S. 1107, 126 S. Ct. 1056 (2006); Rodriguez v. Senkowski, 2004 WL 503451 at *31 & n.42; Besser v. Walsh, 2003 WL 22093477 at *26 & n.59; Dobbin v. Greiner, 249 F. Supp. 2d 241, 249 (S.D.N.Y. 2002).

Other Circuits that addressed the issue have reached the same result. See, e.g., Williams v. Woodford, 396 F.3d 1059, 1069 (9th Cir.), cert. denied, 546 U.S. 934, 126 S. Ct. 419 (2005); Carter v. Kemna, 255 F.3d 589, 591 (8th Cir. 2001), cert. denied, 534 U.S. 1085, 122 S. Ct. 822 (2002); United States v. Harris, 192 F.3d 580, 588 (6th Cir. 1999); United States v. McFerron, 163 F.3d 952, 955-56 (6th Cir. 1998) (suggestion that Batson error can be considered harmless error "has been resoundingly rejected by every circuit court that has considered the issue") (citing cases); Turner v. Marshall, 121 F.3d 1248, 1254 n.3 (9th Cir. 1997), cert. denied, 522 U.S. 1153, 118 S. Ct. 1178 (1998), overruled to a limited extent on other grounds, Tolbert v. Page, 182 F.3d 677, 685 (9th Cir. 1999); Scarpa v. DuBois, 38 F.3d 1, 14 (1st Cir. 1994), cert. denied, 513 U.S. 1129, 115 S. Ct. 940 (1995); United States ex el. Pruitt v. Page, No. 97 C 2115, 1999 WL 652035 at *8-9 (N.D. Ill. Aug. 20, 1999) ("It is the consensus of Courts of Appeals, including the Seventh Circuit, that Batson error is structural and cannot be harmless."), aff'd, 337 F.3d 921 (2003), cert. denied, 540 U.S. 1122, 124 S. Ct. 1081 (2004).

[22]     Because both the First Department and New York Court of Appeals correctly recognized the issue as one of Batson's application (see pages 15-17 above), the AEDPA "unreasonable application" standard applies. See, e.g., Cousin v. Bennett, 511 F.3d 334, 337 (2d Cir. 2008); McKinney v. Artuz, 326 F.3d 87, 98 (2d Cir. 2003); Overton v. Newton, 295 F.3d 270, 275-80 (2d Cir. 2002); Rodriguez v. Senkowski, 03 Civ. 3314, 2004 WL 503451 at *30 n.43 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); Besser v. Walsh, 02 Civ. 6775, 2003 WL 22093477 at *26 n.60 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.), report & rec. adopted, 2003 WL 22846044 (S.D.N.Y. Dec. 2, 2003); Rodriguez v. Lord, 00 Civ. 0402, 2001 WL 1223864 at *18 & nn.43-44 (S.D.N.Y. Oct. 15, 2001) (Peck, M.J.) (& cases cited therein), report & rec. adopted, 2004 WL 2149116 (S.D.N.Y. Sept. 22, 2004); see also cases cited at page 23 n.7 above. The AEDPA standard of review of the state trial judge's factual determinations about the Batson issues is even more circumscribed and deferential. See Miller-El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 1045 (2003); see pages 55-56 below.

     In his petition, Wells asserts that "[t]he trial court violated the Equal Protection Clause of the United States Constitution by denying Mr. Wells's <u>Batson</u> challenge [to potential juror Corliss Brown] when the prosecutor's reason for using a peremptory strike was discriminatory on its face, [thus] forcing Mr. Wells to be tried before a jury selected with race-based discrimination." (Dkt. No. 2: Pet. ¶ 15.)  Wells' petition further alleges that:

> 17.  In response to the court's request for the prosecution's reasons for striking the prospective jurors, the prosecutor stated that she struck Ms. Brown because she reminded the prosecutor of a female, African-American New York State Supreme Court Justice.  The only similarities between Ms. Brown and the Justice in the record are that they are both African-American and female.

> 18.  The prosecution gave three other reasons for the strike:  (1) Ms. Brown allegedly talked with her hand in front of her mouth; (2) she allegedly had an "unsettling gaze"; and (3) she read detective stories.  The first two reasons are unverifiable in the record, and as to the third, several other prospective jurors ultimately chosen were not asked what they liked to read after expressing that they enjoyed reading.

> 19.  The court immediately ruled against Mr. Wells, stating that the reasons were nondiscriminatory, and proceeded directly to the prosecutor's reasons for striking the next juror.

(Pet. ¶¶ 17-19, record citations omitted.)  In his brief, Wells elaborates by arguing:

>     One of the prosecutor's reasons for striking Ms. Brown, an African-American woman, was discriminatory on its face.  When required by the trial court to state the reasons for striking Ms. Brown, the prosecutor cited four "concerns," including that Ms. Brown reminded the prosecutor "of Judge [Dorothy] Cropper which made [the prosecutor] just somewhat anxious in a sort of emotional way."  Justice Dorothy Cropper sat on the Criminal Term of New York County Supreme Court, as a judge in good standing, respected by bench and bar alike.  More importantly, she was one of the few, if not the only, female African-American judges on that court.  The only salient facts regarding this issue that are apparent from the record are that both Justice Cropper and Ms. Brown are African-American, like Mr. Wells, and female.

<u>By relying on her observation that Ms. Brown reminded her of an African-American judge, the prosecutor's reason for striking Ms. Brown was race-based</u>.  As the prosecutor failed to meet her burden to provide a race-neutral explanation, the trial court's rejection of Mr. Wells's <u>Batson</u> challenge "involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States."

While the law has been liberal in accepting implausible reasons for exercising peremptory strikes at the second step of the <u>Batson</u> inquiry, it has never tolerated reasons that are based on race or gender.  Here, the prosecutor struck Ms. Brown because she reminded the prosecutor of an African-American female judge.  The record reflects no possible reason, other than race and gender, that the comparison of a respected New York State Supreme Court Justice to Ms. Brown would lead the prosecutor to strike Ms. Brown.  Therefore, the prosecutor never met her burden at step two, and the burden never shifted back to Mr. Wells to require him to make further argument. [FN6.]

> [FN6.] Even if Mr. Wells was required to make additional argument, the trial court did not afford Mr. Wells's counsel the opportunity to inquire further into the prosecutor's reasons for striking Ms. Brown or to make any additional arguments to create a proper record.  The court ruled immediately after the prosecutor gave the reasons for striking Ms. Brown, and instructed the prosecutor to move on to the reasons for striking the next African-American juror.  After the prosecutor gave reasons for all of the stricken jurors, the court stated, "All right let's move on.  Peremptory challenges [for the defense]."  It was clear that the court was finished with this issue.  The trial court's failure to allow Mr. Wells's counsel to make further arguments cannot be held against Mr. Wells.

> . . . .

That the prosecutor offered other reasons – including the unverifiable reasons about Ms. Brown's hands and glare and the fact that Ms. Brown read detective stories – for the striking of Ms. Brown does not rectify the prosecutor's discrimination.  To the contrary, the prosecutor's proffered reason that she struck Ms. Brown because she read detective stories evidences a discriminatory intent, as the prosecutor did not ask the other selected jurors who indicated that they enjoyed reading whether they read detective stories. [FN7.] . . . . Using an answer to a question asked of Ms. Brown and not other selected jurors to explain the use of a peremptory strike is "an obvious mask for a race-based challenge."

[FN7.]  Four of the eighteen venire members that were chosen as jurors or alternate jurors stated during voir dire that they liked to read in their spare time, but, unlike Ms. Brown, not a single one of them was asked what they like to read. . . . Also, juror Ronald Long was a writer, and the prosecutor never asked him whether he wrote detective stories.

Furthermore, when a proponent of a strike provides both race-based and race-neutral reasons for striking a prospective juror, the burden remains on the prosecutor to demonstrate by a preponderance of the evidence that "the same challenge[] would have been exercised for race-neutral reasons in the absence of such partially improper motivation."

. . . . The three reasons given by the prosecutor are wholly unrelated to the case against Mr. Wells, and a reasonable person would not regard the presence of any of these reasons as undesirable in the case.  The prosecution failed to explain how Ms. Brown's alleged "unsettling gaze" or hand placement were related to the particular case against Mr. Wells.  The prosecutor's concern about Ms. Brown's affinity for detective stories is similarly irrelevant to the particular case against Mr. Wells.  Ms. Brown's assertions under oath during voir dire would have led a reasonable person to conclude that Ms. Brown would not have held the prosecution to a higher burden of proof than required by the court.  Therefore, the prosecutor did not meet her burden of proving that she would have struck Ms. Brown in the absence [of] the racially discriminatory reason.

(Dkt. No. 3: Wells Br. at 22-25, emphasis added, citations omitted, bracketed alterations in original.)

## 2.  **Batson's Step One**

During voir dire, the defense made a <u>Batson</u> challenge, and Justice Tejada directed the prosecutor to state her reasons for challenging Ms. Brown (and several other prospective jurors).  (<u>See</u> pages 4-5 above.)  After hearing the prosecutor's reasons for the challenges, Justice Tejada determined that the reasons were not pretextual, and denied the <u>Batson</u> motion.  (<u>See</u> pages 5-7 above.)

This Court need not determine whether the defense established a prima facie showing of intentional racial discrimination, i.e., satisfied step one of the Batson test.  (See page 32 above.) That issue became moot once the trial judge ruled on the Batson question.  See, e.g., Miller-El v. Cockrell, 537 U.S. 322, 338, 123 S. Ct. 1029, 1040 (2003); Hernandez v. New York, 500 U.S. 352, 359, 111 S. Ct. 1859, 1866 (1991) ("Once a [non-moving party] has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the [moving party] had made a prima facie showing becomes moot."); United States v. Brown, 352 F.3d 654, 660 (2d Cir. 2003); McKinney v. Artuz, 326 F.3d 87,  98 (2d Cir. 2003) ("The Supreme Court has held that the prima facie case of discriminatory intent becomes irrelevant to the analysis of a peremptory challenge once the trial court proceeds to the second and third steps as it did here."); United States v. Franklyn, 157 F.3d 90, 97 (2d Cir. 1998), cert. denied, 525 U.S. 1112, 119 S. Ct. 887 (1999).[23]

---

[23]    See also, e.g., Machicote v. Ercole, 06 Civ. 13320, 2008 WL 169348 at *11 (S.D.N.Y. Jan. 18, 2008); Dotson v. Ercole, 06 Civ. 7823, 2007 WL 1982730 at *5 (S.D.N.Y. July 10, 2007); Welch v. Artus, No. 04-CV-205S, 2007 WL 949652 at *57 (W.D.N.Y. Mar. 29, 2007); Jones v. West, 473 F. Supp. 2d 390, 411 (W.D.N.Y. 2007); Huggins v. Girdick, No. 03-CV-3248, 2007 WL 433397 at *10 n.7 (E.D.N.Y. Feb. 7, 2007); Valentine v. New York, 04 Civ. 1411, 2006 WL 2135779 at *4 (S.D.N.Y. Aug. 1, 2006), aff'd, 2007 WL 3196478 (2d Cir. 2007); Lewis v. Bennett, 435 F. Supp. 2d 184, 190 (W.D.N.Y. 2006); Funches v. Walsh, 05 Civ. 2839, 2006 WL 1063287 at *6 n.12 (S.D.N.Y. Apr. 21, 2006), aff'd, 2008 WL 376352 (2d Cir. 2008); Rose v. Senkowski, No. 99 CV 6053, 2005 WL 4655394 at *12 (E.D.N.Y. July 25, 2005), report & rec. adopted, 2006 WL 1720445 (E.D.N.Y. Jun. 22, 2006); Isaac v. Greiner, 01 Civ. 2178, 2005 WL 1713036 at *6 (S.D.N.Y. July 19, 2005), aff'd, 205 Fed. Appx. 873 (2d Cir. 2006); Swift v. Goord, 02 Civ. 3448, 2004 WL 2434966 at *4 (S.D.N.Y. Nov. 1, 2004); Francis v. Duncan, 03 Civ. 4959, 2004 WL 1878796 at *14 (S.D.N.Y. Aug. 23, 2004); Rodriguez v. Senkowski, 03 Civ. 3314, 2004 WL 503451 at *32
(continued...)

### 3.     Batson's Step Two

The second step of the Batson analysis – that the non-moving party (here, the prosecution) come forward with a race-neutral explanation for its peremptory challenge – "does not demand an explanation that is persuasive, or even plausible.  'At this [second] step of the inquiry, the issue is the facial validity of the [non-movant's] explanation.  Unless a discriminatory intent is inherent in the [non-movant's] explanation, the reason offered will be deemed race neutral.'" Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 1771 (1995).[24/]  The Supreme Court has clarified that:

> It is not until the third step that the persuasiveness of the justification becomes relevant– the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.  At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination.  But to say that a trial judge may choose to disbelieve a silly or superstitious reason at step 3 is quite different from saying that a trial judge must terminate the inquiry at step 2 when the race-neutral reason is silly or superstitious.  The latter violates the principle

---

[23/]     (...continued)
(S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); Besser v. Walsh, 02 Civ. 6775, 2003 WL 22093477 at *26 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.), report & rec. adopted, 2003 WL 22846044 (S.D.N.Y. Dec. 2, 2003); Baker v. Bennett, 235 F. Supp. 2d 298, 307 n.12 (S.D.N.Y. 2002); Durant v. Strack, 151 F. Supp. 2d 226, 236-42 (E.D.N.Y. 2001); Owens v. Portuondo, 98 Civ. 6559, 1999 WL 378343 at *9 (S.D.N.Y. June 9, 1999) (Peck, M.J.), aff'd, 205 F.3d 1324 (2d Cir. 2000); United States v. Moore, 4 F. Supp. 2d 319, 321 (S.D.N.Y. 1998).

[24/]     Accord, e.g., Green v. Travis, 414 F.3d 288, 301 (2d Cir. 2005); Overton v. Newton, 295 F.3d 270, 276 (2d Cir. 2002); Christian v. Artus, 04 Civ. 10174, 2006 WL 2463432 at *6 (S.D.N.Y. Aug. 23, 2006); Rodriguez v. Senkowski, 03 Civ. 3314, 2004 WL 503451 at *32 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); Besser v. Walsh, 02 Civ. 6775, 2003 WL 22093477 at *26 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.), report & rec. adopted, 2003 WL 22846044 (S.D.N.Y. Dec. 2, 2003); Owens v. Portuondo, 98 Civ. 6559, 1999 WL 378343 at *9 (S.D.N.Y. June 9, 1999) (Peck, M.J.), aff'd, 205 F.3d 1324 (2d Cir. 2000); see also, e.g., People v. Payne, 88 N.Y.2d 172, 183, 643 N.Y.S.2d 949, 956 (1996).

41

that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.

The Court of Appeals appears to have seized on our admonition in <u>Batson</u> that to rebut a prima facie case, the proponent of a strike "must give a 'clear and reasonably specific' explanation of his 'legitimate reasons' for exercising the challenges" and that the reason must be "related to the particular case to be tried."  This warning was meant to refute the notion that the [non-movant] could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith.  What it means by a "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection.

<u>Purkett</u> v. <u>Elem</u>, 514 U.S. at 768-69, 115 S. Ct. at 1771 (citations omitted).[25]

Nevertheless, as the Second Circuit has stated, "[i]t is rare that a <u>Batson</u> violation occurs where a prosecutor fails to put forth an adequate explanation at step two.  As the Supreme Court has made clear, because the burden of persuasion always rests with the opponent of the strike, 'even if the State produces only a frivolous or utterly nonsensical justification for its strike, the case does not end - it merely proceeds to step three.'"  <u>Richardson</u> v. <u>Greene</u>, 497 F.3d 212, 219 (2d Cir. 2007) (quoting <u>Johnson</u> v. <u>California</u>, 545 U.S. 162, 171, 125 S. Ct. 2410, 2417 (2005)).

In this case, the prosecution asserted that it struck Brown because she "answered questions with her hand over her face" which can "signif[y] as a matter of body language something to hide," she had "an unsettling gaze," she "read detective stories" which meant she "might have [an] expectation of what should be part of a case," and she also reminded the prosecutor "of Judge

---

[25]     Accord, <u>e.g.</u>, <u>Jordan</u> v. <u>Lefevre</u>, 206 F.3d 196, 200 (2d Cir. 2000) ("<u>Batson</u> analysis recognizes that a race neutral reason may be rational and yet be a pretext for discrimination."); <u>Rodriguez</u> v. <u>Senkowski</u>, 2004 WL 503451 at *32-33; <u>Besser</u> v. <u>Walsh</u>, 2003 WL 22093477 at *26-27; <u>Owens</u> v. <u>Portuondo</u>, 1999 WL 378343 at *9-10; <u>see also</u>, <u>e.g.</u>, <u>People</u> v. <u>Payne</u>, 88 N.Y.2d at 183, 643 N.Y.S.2d at 956.

Cropper which made [the prosecutor] just somewhat anxious in a sort of an emotional way." (See page 5 above.)  Wells contends that the reference to Justice Cropper, an African-American judge, was not facially race-neutral, and thus that the prosecution did not satisfy the second Batson step.

"Because peremptory challenges may allow 'those to discriminate who are of a mind to discriminate,' . . . it is the duty of the trial court to inquire into the motivation for the peremptory challenge when a defendant makes a prima facie showing of racial discrimination in the prosecutor's pattern of peremptory strikes.  A court insufficiently protects the defendant's equal protection rights when in its haste to speed along the proceedings it declares that a reason is 'rational' without making the critical determination as to purposeful discrimination that Batson requires."  Jordan v. Lefevre, 206 F.3d at 197-98.

Wells relies on the Second Circuit's decision in Howard v. Senkowski, 986 F.2d 24, 30 (2d Cir. 1993), for the proposition that "when a proponent of a strike provides both race-based and race-neutral reasons for striking a prospective juror, the burden remains on the prosecutor" – "as part of the second step of the Batson inquiry" – to show "that 'the same challenge[] would have been exercised for race-neutral reasons in the absence of such partially improper motivation.'" (Dkt. No. 3: Wells Br. at 24-25.)  While Howard recognized a "dual motivation analysis" for Batson inquiries, Howard v. Senkowski, 986 F.2d at 30, it did not state, as Wells claims, that such analysis applies at the second, as opposed to the third, Batson step.  In fact, by analogizing to the pretext and dual motivation analysis in the three step analysis in Title VII cases, Howard indicated that this dual motivation analysis would occur at the third Batson step:

43

> Dual motivation analysis, in effect, may supplement so-called "pretext" analysis, which applies to a claimant's "burden of persuading the court that [he or] she has been the victim of intentional discrimination."  When the issue is the all-or-nothing question of whether or not an impermissible consideration motivated the challenged action, . . . pretext analysis employs the familiar three-step approach . . . .  Once the claimant has proven improper motivation, dual motivation analysis is available to the person accused of discrimination to avoid liability by showing that the same action would have been taken in the absence of the improper motivation that the claimant has proven.
>
> The two forms of analysis are not incompatible.  <u>The claimant always has to prove discriminatory motivation.</u>  If he succeeds, the accused party has an opportunity to show that there were really two motives and that a permissible motive would have led to the challenged action.  In effect, the accused party is permitted to show, if he can, that the improper motivation proved by the claimant was only part, and not the decisive part, of the motivation.

<u>Howard</u> v. <u>Senkowski</u>, 986 F.2d at 27 & 30 (citations & fn. omitted, emphasis added).  Indeed, the Second Circuit subsequently made clear that the dual motivation analysis is triggered only after the movant has met his burden at <u>Batson</u>'s third step to show purposeful discrimination.  <u>See</u> <u>United States</u> v. <u>Taylor</u>, 92 F.3d 1313, 1328 (2d Cir. 1996) ("[D]ual motivation analysis is appropriate in those cases where the opponents of a challenge 'can show that racial discrimination was a substantial part of the motivation' for the challenge, that is, they have met their burden under <u>Batson</u>. . . . However, the dual motivation analysis <u>shifts the burden to the proponent of the strike after the opponent of the strike . . . has met its 'ultimate burden</u> of persuasion regarding racial motivation.'") (citing cases, emphasis added), <u>cert. denied</u>, 519 U.S. 1093, 117 S. Ct. 771 (1997).[26]

---

[26]    <u>See also</u>, <u>e.g.</u>, <u>Kesser</u> v. <u>Cambra</u>, 465 F.3d 351, 374-75 (9th Cir. 2006) (concurring opinion) ("That 'the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the [victim of the alleged discrimination]' in single-motive <u>Batson</u> cases . . . does (continued...)

Thus, the Second Circuit in <u>Howard</u> recognized use of a dual motivation analysis, where necessary, at <u>Batson</u>'s third step, as follows:

> [W]e conclude that <u>Batson</u> challenges may be brought by defendants who can show that racial discrimination was a substantial part of the motivation for a prosecutor's peremptory challenges, leaving to the prosecutor the affirmative defense of showing that the same challenges would have been exercised for race-neutral reasons in the absence of such partially improper motivation. . . .

> [O]nce the prosecutor's partially improper motivation had been established, [petitioner] was entitled to prevail unless, under dual motivation analysis, the prosecutor could sustain his burden of showing that he would have exercised his challenges solely for race-neutral reasons.

<u>Howard</u> v. <u>Senkowski</u>, 986 F.2d at 30 (emphasis omitted); <u>accord</u>, <u>e.g.</u>, <u>Kesser</u> v. <u>Cambra</u>, 465 F.3d at 374-75 ("As the Second Circuit explained in <u>Howard</u>, <u>Batson</u> requires the application of mixed-motive analysis when mixed motives are present . . . . In light of the Supreme Court's unwavering application of mixed-motive analysis in evaluating whether a mixed-motive decision is lawful, and considering <u>Batson</u>'s place in the Supreme Court's equal protection jurisprudence, [the state courts'] failure to apply mixed-motive analysis constituted an 'unreasonabl[e] refus[al]' to extend clearly established federal law, as determined by the Supreme Court, to a context where it should apply."); <u>United States</u> v. <u>Brown</u>, 352 F.3d 654, 662 n.5 (2d Cir. 2003) ("[W]hile we have noted that such dual motivations can be acceptable defenses in <u>Batson</u> cases, we have placed the

---

[26]/    (...continued)
not alter the fact that mixed-motive analysis must be used when prosecutors or civil rights defendants offer racially motivated justifications for their conduct in <u>Batson</u> cases . . . . There is no support for the dissent's assertion that <u>Purkett</u> somehow excepted <u>Batson</u> from the Supreme Court's equal protection jurisprudence and held that mixed-motive analysis is not appropriate when a prosecutor provides racially discriminatory reasons at step two.").

burden on the party making a dual motivation defense to demonstrate affirmatively that it would

have acted the same way regardless of the improper motive.") (citation omitted); Gattis v. Snyder,

278 F.3d 222, 234-35 (3d Cir.) (adopting the Second Circuit's conclusion in Howard regarding dual

motivation analysis for Batson issues), cert. denied, 537 U.S. 1049, 123 S. Ct. 660 (2002).[27]

### 4.    The Need for a Reconstruction Hearing

Whether considered at step two as Wells incorrectly claims, or properly at step three,

since the state court record is silent as to the explanation for the prosecutor's comparison of potential

juror Brown to Justice Cropper, an African-American judge, this Court was not able to determine

from the state record the prosecutor's intent.

"When the Batson claim is asserted by a state prisoner petitioning for habeas corpus

in federal court, if the state court has not performed this task adequately, the responsibility for

---

[27]    See also, e.g., United States v. Tokars, 95 F.3d 1520, 1533 (11th Cir. 1996) ("This circuit, however, has recently joined three other circuits in adopting dual motivation analysis for purposes of Batson."), cert. denied, 520 U.S. 1151, 117 S. Ct. 1328 (1997); United States v. Taylor, 92 F.3d at 1328 ("As stated in Howard v. Senkowski, dual motivation analysis is appropriate in those cases where the opponents of a challenge 'can show that racial discrimination was a substantial part of the motivation' for the challenge, that is, they have met their burden under Batson."); Wallace v. Morrison, 87 F.3d 1271, 1273, 1274-75 (11th Cir.) (upholding the district court's adoption of Howard and application of dual motivation analysis), cert. denied, 519 U.S. 1044, 117 S. Ct. 616 (1996); United States v. Darden, 70 F.3d 1507, 1531-32 (8th Cir. 1995) (citing Howard and applying dual motivation analysis where the prosecutor struck, on the basis of youth, inexperience, and alleged "tendency of young black women to sympathize with drug dealers"), cert. denied, 517 U.S. 1149, 116 S. Ct. 1449 (1996); Jones v. Plaster, 57 F.3d 417, 421-22 (4th Cir. 1995) (citing Howard and applying dual motivation analysis but remanding to the district court to "articulate whether the strike was exercised for a discriminatory purpose, and, if so, whether the strike would have been exercised even had a discriminatory purpose not been present").

assessing the prosecutor's credibility and determining his intent falls on the [federal habeas] judge."
Jordan v. Lefevre, 293 F.3d 587, 593 (2d Cir. 2002); see also, e.g., Jordan v. Lefevre, 206 F.3d 196,
202 (2d Cir. 2000) (Remanding to allow "the district court to, in its discretion, hold a hearing to
reconstruct the prosecutor's state of mind at the time of jury selection," if possible after the passage
of time.).    This Court therefore held a reconstruction hearing to further clarify the prosecutor's
motivation for peremptorily challenging Brown.   See, e.g., Green v. Travis, 414 F.3d 288, 299-300
(2d Cir. 2005) (Upholding denial of Batson claim; "the district court did not abuse its discretion
when it permitted the reconstruction hearing and relied upon the testimony offered at that hearing
to reconstruct the prosecutor's reasons," even where "the prosecutor had little specific recall of the
jury selection in the case."); Galarza v. Keane, 252 F.3d 630, 640 (2d Cir. 2001) (remanding and
"leav[ing] to the district court the determination of whether to expand the record as it may deem
appropriate to resolve Galarza's Batson claims"); Barnes v. Anderson, 202 F.3d 150, 156-57 (2d Cir.
1999) ("Where a court fails to make such a [credibility] finding with respect to the proffered
explanation for each challenged strike, 'the appropriate course [usually will be] to remand for
findings by the [court] as to [the challenged strikes] and an ultimate determination on the issue of
discriminatory intent based on all the facts and circumstances.'"); Bryant v. Speckard, 131 F.3d 1076,
1078 (2d Cir. 1997) (reconstruction hearing held by state court was adequate where prosecutor
remembered voir dire over six years after jury selection and was subject to cross-examination by
defendant), cert. denied, 524 U.S. 907, 118 S. Ct. 2066 (1998); Brown v. Kelly, 973 F.2d 116, 121
(2d Cir. 1992) (upholding reconstruction where the prosecutor did not have contemporaneous notes

of the voir dire but could provide from memory "relatively detailed accounts of his racially neutral" justifications for peremptory strikes over six years after jury selection), cert. denied, 506 U.S. 1084, 113 S. Ct. 1060 (1993); United States v. Stavroulakis, 952 F.2d 686, 696 (2d Cir.), cert. denied, 504 U.S. 926, 112 S. Ct. 1982 (1992).

Wells' jury selection occurred in June 2001, approximately six and one-half years ago. "The determination of whether the passage of time has foreclosed a reasoned reconstruction is, in the first instance, a matter for the court that attempts the reconstruction, for that court will have before it not only the trial record, but also the parties whose recollections and explanations are to be explored." Jordan v. Lefevre, 293 F.3d at 593; see, e.g., Bryant v. Speckard, 131 F.3d at 1077-78 (reconstruction possible six and one-half years after jury selection); Brown v. Kelly, 973 F.2d at 121-22 (reconstruction feasible more than six years after jury selection).  This Court finds, as demonstrated below, that it is possible to determine in this case, approximately six and one-half years later, A.D.A. Schwartz's motivation in exercising her challenge to Brown during jury selection.

**5.    The Evidence at the Reconstruction Hearing**

A.D.A. Amy Schwartz, the lead prosecutor at Wells' trial, was the only witness at the reconstruction hearing.  (2/21/08 Reconstruction Hearing ["R.H."] at 10-78.)[28/]  A.D.A. Schwartz, a fifteen year veteran of the D.A.'s Office, is now the Deputy Bureau Chief of one of the New York County District Attorney's Office's trial bureaus.  (R.H. 10-11.)  A.D.A. Schwartz only tried two

---

[28/]    Wells participated by videoconference, but did not testify, and Wells' trial attorney, Joel Stein, was present "as a possible rebuttal witness" (R.H. 4) but did not testify.

homicide cases, of which Wells' trial was one, and had some independent recollection of jury selection in Wells' trial.  (R.H. 12-13.)

In preparation for this Court's reconstruction hearing, A.D.A. Schwartz "read the transcript of [Wells'] jury selection," "reviewed [her] jury selection notes, which is to say the ones [she] took in court during jury selection," and "reviewed the typed notes [she had] prepared for [her]self prior to jury selection." (R.H. 13.)

A.D.A. Schwartz described the voir dire process in Wells' case.  (R.H. 14-21.) A.D.A. Schwartz identified her typed notes, i.e., her script for jury selection, that she had prepared for use in Wells' jury selection.  (R.H. 24-27; People's Ex. 2.) A.D.A. Schwartz's script included the reminder to herself of "Remember: body language."  (People's Ex. 2, p. 8.)  A.D.A. Schwartz explained:

> A.  Under that the next line is "remember" and a colon, and then under that "body language."  And that's essentially, again, so that I don't just get wrapped up in taking notes and looking down; that I remember to look up and see, you know, how people are being and what they're doing.
>
> Q.  . . . So, from this were you telling yourself to focus on body language, is that correct?
>
> A.  That was certainly one of the factors that I was looking at, yes.

(R.H. 27.) A.D.A. Schwartz expanded on the importance of demeanor when describing the attributes she looks for in selecting jurors generally:

> Q.  . . . Now when you are picking a juror, are there general attributes you look for?
>
> A.  To some degree, yes.

Q.    And, can you tell us about those?

A.    For the most part I'm looking for sort of normal, intelligent people who are open to hearing the People's case.  I don't want anyone – you know, I don't want anyone who strikes me as a kook in some way. . . .

       But, basically people who – people who can make a hard decision, people who are open to, you know, people who aren't hostile to the people's case, people who, you know – people who can make a fair decision.

Q.    Any other factors or things you specifically look for when deciding to pick or exclude a juror?

A.    Well, I mean, I try to look at everything.  <u>Body language is important to me</u> because in general if – I don't know, I must have taken a course on body language at some point.

       For example, <u>I perceived crossed arms as a sign of withdrawal</u>.  I know when I'm summing up in a case if I still have jurors with crossed arms I will try to find additional things I can say to be persuasive because I am perceiving the crossed-arm jurors as not necessarily agreeing with me at that point.

       So, during jury selection, you know, that sort of body language, either interest or withdrawal.  If one of the things – and <u>this also goes to what I tell my witnesses when they're testifying, if someone has their hand over their mouth it, to me, shows that there is something that they're trying not to say or holding back</u>.

       And, you know, what I tell my witnesses is if you can't figure out what to do with your feet, keep them on the floor.  If you can't figure out what to do with your hands, keep them in your lap.  Sit up straight.  But, <u>whatever you do, don't keep your hand over the mouth because the jury can't hear you and it also looks like you are trying to hide something</u>.  So, that all kind of fits in.

       In addition there was –

Q.    Continue, please.

A.    There are some professions that I try to avoid.

Journalists make me self-conscious because I never know if they're going to go out and write some kind of story so I don't want journalists on the jury.

Touchy-feely occupations, sort of social workers, psychologists I don't want. Teachers can be a touchy-feely occupation, but someone at some point taught me that if you ask whether a teacher had ever failed someone, a teacher who has failed someone is someone who, in the middle of touchy-feely occupation has been able to make sort of a difficult decision. So, that sort of almost turns a negative into a positive.

(R.H. 21-23, emphasis added.)

A.D.A. Schwartz explained that when she was picking the jury for Wells' trial, race was not "a significant factor in this case in [her] mind," because the victims were white, black and Hispanic, and the key police witness (Detective Smith) was black, as was Wells. (R.H. 27-28.)

Consistent with her explanations to Justice Tejada at the time of the Batson challenge, A.D.A. Schwartz expanded on her reasons for striking venireperson Corliss Brown:

Q.    . . . Did you strike Corliss Brown because she was black?

A.    No.

Q.    Why did you strike her?

A.    It was a combination of things.

The principal one was sort of aspects of her demeanor and, in addition, there was something about her that, as I told the Judge [Tejada], reminded me of Justice Dorothy Cropper before whom I had a trial at some point in the past and that sort of affected me negatively.

And then, in addition, one of the questions that I had asked her during the jury selection process was about she said she read. And I asked her what

kind of things she read and she mentioned detective stories which, you know, by itself is – the thing about detective stories, it is a precursor to what we now call the CSI effect; that people who, you know, read detective stories or watch crime shows and so forth, have certain expectations about what should be in the prosecutor's case; they might be more demanding and also expect to have things more wrapped up, the Ts crossed and the I[]s dotted the way you would see in a book or a movie rather than the way real life plays out.

So, it was, as I say, various aspects of the demeanor, the Cropper issue and the reading.

Q.     Now, you mentioned various aspects of her demeanor. Could you elaborate on that, please?

A.     She had had her hand over her mouth during the jury selection. She had closed facial expression of some kind. I can't quite reconstruct it but it – the overall effect was sort of negative. And, she had an unsettling gaze.

The crossed hands – the hand over mouth, I'm trying to remember it the best I can, I think it was either something like this with sort of one arm across and one arm up or the other way one –

(R.H. 33-34; see also R.H. 45-46, 49-51, 74-75.)

A.D.A. Schwartz indicated that she had a negative reaction to Brown's demeanor while Justice Tejada was asking questions, even before A.D.A. Schwartz began her questioning:

Well, jury selection is sort of an imprecise science and in the first round, with all 20 challenges ahead, it is rather easier to be picky and to, you know, to be unsatisfied with a juror based on certain factors.

I mean, it was a totality of everything about Corliss Brown that certainly made her stand out and, in particular, the demeanor. There was something about the look. I mean, I don't remember now what made me write down hidden agenda, but I don't recall writing that – well, I certainly didn't write anything like that for any other juror here. It was something about the way she looked that made me feel that she wasn't being up front, that she was essentially hostile. I mean, hand over mouth was sort of part of it.

But, you know, as the notes indicate, you know, demeanor or closed facial expression, the unsettling gaze. I mean, it seemed to me that I had basically reacted to her demeanor in some respect before I even stood up to ask her questions because I didn't ask her as many questions as I asked some other jurors that I was more interested in delving into because <u>there was something about the demeanor that had already given me a negative vibe about her attitude to being there</u>.

(R.H. 74-75, emphasis added.)

A.D.A. Schwartz identified her contemporaneous jury selection notes, People's Ex. 3, and explained her note taking system. (R.H. 28-33.) A.D.A. Schwartz's contemporaneous notes from jury selection corroborate that she was concerned about Corliss Brown's demeanor:

> Q.    Now, if you could look at your notes once again? Could you explain to the Court the notes and symbols you made for Corliss Brown?
>
> A.    Corliss Brown was seated in the ninth jury seat so I have her in the box in that place on the sheet. It says Corliss Brown. The squiggly line underneath indicates that she's female. Then it says 55 Y-O for – Y-O for years old. Under that there is like a carat mark and the <u>word "demeanor."</u>[29] To the right of that there is some likes kind of from the word "demeanor" like angled out and to the right, to the middle and lower – in other words, <u>kind of lines connecting the demeanor thought to the next few words</u>.
>
>        <u>The first thing that's written over to the right there is hidden agenda.</u> <u>Under that it says hand over mouth. Under that it says closed facial expression.</u> Well, it is E-X-P-R which would be for expression. And under that it says <u>unsettling gaze</u>.

(R.H. 35-36, emphasis added; <u>see</u> People's Ex. 3.) A.D.A. Schwartz added that Brown's "overall demeanor was closed," and her "overall impression was sort of closed or more hostile." (R.H. 50.)

---

[29]    A.D.A. Schwartz explained that the carat mark "is sort of an emphasis point like, you know, notice this, don't miss this." (R.H. 37.)

A.D.A. Schwartz's contemporaneous notes also reflected her concern about Brown's reading detective stories:

> A.    And under that, travel and reading; that would have been what she does in her spare time in answer to the Judge's question, I believe.  And then there is – in green there is an arrow and it says *what kind of reading* and that would be my question to myself; in other words, ask her what things she reads.  Under that, in blue, it says "detective stories."  I would have had to have written that after asking her the question in order to know the answer.

(R.H. 38; <u>see</u> People's Ex. 3.)

While two other jurors also had their hands over their mouths, A.D.A. Schwartz explained why she did not challenge them, including the fact that one had a very favorable experience with the police.  (R.H. 46-49, 67-72.)  Also, while there were other people in the venire who said they read, A.D.A. Schwartz explained that in the later venire rounds, Justice Tejada gave the parties less time for questioning, so she – and her "second chair" who did the questioning in some of the later rounds – might not have had time to follow up on reading habits.  (R.H. 53-58, 67-68.)

A.D.A. Schwartz testified that prior to Wells' trial, she had tried a case before Justice Cropper and "it was not a pleasant experience."  (R.H. 39-42.)  A.D.A. Schwartz called Justice Cropper "an unpleasant authority figure" who had "chewed [her] out" during that earlier trial and made her "feel small and stupid."  (R.H. 40, 41.)  Something about venireperson Corliss Brown reminded A.D.A. Schwartz of Justice Cropper – "whether it was a look, either the gaze, whether it was something about her facial expressions, something about just her overall physical resemblance."  (R.H. 39; <u>see also</u> R.H. 52-53.)

When the Court asked point blank if the "resemblance" of Corliss Brown to Justice Cropper was racial, A.D.A. Schwartz unequivocally denied it:

> THE COURT:  The other question, going to the Justice Cropper issue. Mr. Wells' counsel has argued in their habeas petition that Corliss Brown was, apparently, an African American female; Justice Cropper apparently was an African America female.  Was it that physical appearance, shall we say, as opposed to your experience with Justice Cropper or something else?  Or what was it to convince the Court that it was not a race-based strike?

> [A.D.A. SCHWARTZ]:  Well, <u>my experience with Justice Cropper had nothing to do with Justice Cropper's race.  She could have been of any race and I still would have had that feeling about her based on my experience in her courtroom</u>.

> So, it wasn't that I have had some experience with a black female judge, ergo black female judges are in a negative category; <u>it was being reminded of this Judge who had made me feel small, this sort of authority figure who had chewed me out</u>. And, I can say there are judges of several genders or – well both genders and several races for whom a – several races – I don't know – there are black judges and white judges and male judges and female judges, and probably each combination of those – not a hundred percent sure of all the boxes in that little diagram but, you know, <u>a judge who made me uncomfortable or chewed me out in court is not someone I would want to be thinking about when I looked at the jury box</u>.  And, someone who had either a resemblance in mannerism or appearance to a judge, I guess to give the best example – and your Honor has been very nice to me so far – but if you were to chew me out somehow and I were to come up to my next jury panel and see someone who looked like your twin, <u>I wouldn't want that person on my jury because it would [] distract me from the business of proving the case before the Court</u>.

(R.H. 75-76, emphasis added.)

Finally, A.D.A. Schwartz unequivocally testified that even if Corliss Brown had not reminded her of Justice Cropper, she still would have exercised a peremptory challenge because of Brown's demeanor:

> Q.     Now, disregarding the fact that . . . Corliss Brown reminded you of Justice Cropper, would you still have exercised a peremptory challenge against her?

A.    Yes.

Q.    Why is that?

A.    The body language was hostile or negative and that's not something I look for in a juror.

(R.H. 43-44.)

I find A.D.A. Schwartz to have been completely credible in her testimony (corroborated by her contemporaneous notes of jury selection) and fully credit her testimony in all respects. (See R.H. 80, 81, where I stated that "I do find it [A.D.A. Schwartz's testimony] to be credible and believable, just to give you a little advance notice of where my opinion is going to be going.")

### 6.    Batson's Step Three

The Court reiterates that on habeas review, it must give "great deference" to the trial court's findings as to the third Batson step. See, e.g., 28 U.S.C. §§ 2254(d)(2) & (e); Purkett v. Elem, 514 U.S. 765, 769, 115 S. Ct. 1769, 1771 (1995); Hernandez v. New York, 500 U.S. 352, 364-65, 111 S. Ct. 1859, 1868-69 (1991); Batson v. Kentucky, 476 U.S. 79, 98 n.21, 106 S. Ct. 1712, 1724, n.21 (1986); McKinney v. Artuz, 326 F.3d 87, 100-01 (2d Cir. 2003); Bryant v. Speckard, 131 F.3d 1076, 1077 (2d Cir. 1997) ("A state court's determination whether a prosecutor's use of a peremptory challenge was motivated by discriminatory intent, in violation of Batson, is a factual determination and thus qualifies for [former § 2254(d)'s] presumption of correctness."), cert. denied, 118 S. Ct. 2066 (1998); Brown v. Kelly, 973 F.2d 116, 120, 122 (2d Cir. 1992) (the trial court's "decision on the factual question of discriminatory animus, largely based on determinations of credibility, is

ordinarily given 'great deference' on appeal" and habeas review), <u>cert. denied</u>, 506 U.S. 1084, 113

S. Ct. 1060 (1993).<u>30/</u>

       Justice Tejada's findings that the prosecutor's reasons for her challenge to Corliss

Brown were not discriminatory were reasonable.  (Indeed, this Court found the prosecutor's

testimony at the reconstruction hearing about her reasons for striking Brown to be credible; <u>see</u> page

55 above.)  The prosecutor stated that one reason she challenged Brown was because Brown

"answered questions with her hand over her face" which, according to the prosecutor, can "signif[y]

as a matter of body language something to hide," and Brown had "an unsettling gaze."  (<u>See</u> pages

5, 51-52 above.)  The Second Circuit has accepted demeanor as a valid, race-neutral basis for a

peremptory challenge:

> An impression of the conduct and demeanor of a prospective juror during the voir
> dire may provide a legitimate basis for the exercise of a peremptory challenge.  The
> fact that a prosecutor's explanations in the face of a <u>Batson</u> inquiry are founded on
> these impressions does not make them unacceptable if they are sufficiently specific
> to provide a basis upon which to evaluate their legitimacy.

---

<u>30/</u>    See also, <u>e.g.</u>, <u>United States</u> v. <u>Alvarado</u>, 951 F.2d 22, 25 (2d Cir. 1991) ("As we have
recognized, the task of assessing the prosecutor's explanations, in order to determine the
ultimate issue of whether discrimination has been shown, falls primarily upon the judicial
officer conducting the jury selection, whose determinations as to credibility of the proffered
explanations are entitled to 'appropriate deference.'"); <u>Besser</u> v. <u>Walsh</u>, 02 Civ. 6775, 2003
WL 22093477 at *27 (S.D.N.Y. Sept. 10, 2003) (Peck, M.J.), <u>report & rec. adopted</u>, 2003
WL 22846044 (S.D.N.Y. Dec. 2, 2003); <u>Durant</u> v. <u>Strack</u>, 151 F. Supp. 2d 226, 235-36
(E.D.N.Y. 2001) ("Because the trial judge is uniquely situated to assess the striking attorney's
state of mind based on credibility and demeanor, . . . 'a reviewing court ordinarily should give
those findings great deference.'"); <u>Owens</u> v. <u>Portuondo</u>, 98 Civ. 6559, 1999 WL 378343 at
*10 (S.D.N.Y. June 9, 1999) (Peck, M.J.), <u>aff'd</u>, 205 F.3d 1324 (2d Cir. 2000).

Brown v. Kelly, 973 F.2d at 121 (upholding peremptory challenges based on prosecutor's perception of one juror's "timidity" and "nervousness," another juror's "flippant" answers and flirtatious manner with defense counsel, and a third juror's hostility and unresponsiveness); see also, e.g., Messiah v. Duncan, 435 F.3d 186, 200-01 (2d Cir. 2006) (upholding peremptory challenge due partially to juror's "inattentiveness during voir dire - he was reported to be reading the newspaper"); Green v. Travis, 414 F.3d 288, 300 (2d Cir. 2005) ("[T]he unfavorable demeanor of a venireperson has been held to be a race-neutral explanation for a peremptory challenge.") (citing cases); Moore v. Walker, No. 99-2754, 234 F.3d 1262 (table), 2000 WL 1721120 at *2 (2d Cir. Nov. 16, 2000) (upholding as race-neutral peremptory challenges based on "inattentiveness" and "demeanor"); Bryant v. Speckard, 131 F.3d at 1077-78 (upholding peremptory challenges based on juror's "discomfort and apprehension"); United States v. Gibson, 105 F.3d 1229, 1232 (8th Cir. 1997) (upholding peremptory challenge of juror who appeared uninterested in the proceedings); United States v. Hinton, 94 F.3d 396, 397 (7th Cir. 1996) ("Body language has long been used as a basis for peremptory challenges. . . . The 'science' of choosing jurors often depends on the intuitive senses of the attorneys, and the non-discriminatory exercise of that intuition has been long upheld by the courts."); McCrory v. Henderson, 82 F.3d 1243, 1247-48 (2d Cir. 1996) (Peremptory challenge "decisions may legitimately be based not only on answers given by the prospective juror to questions posed on voir dire, but also on the prosecutor's observations of the prospective juror."); United States v. Casper, 956 F.2d 416, 418-19 (3rd Cir. 1992) (prosecutor's evaluation of juror's "credibility and demeanor"); United States v. Rudas, 905 F.2d 38, 41 (2d Cir. 1990) (juror's inattentiveness); United

States v. <u>Ruiz</u>, 894 F.2d 501, 506 (2d Cir. 1990) (juror making "'facial expressions'" suggesting "'that she really did not want to sit,'" "staring strangely," and not being "'particularly articulate'"; another juror "'didn't seem to have the strength of his convictions'" and seemed "'to be shaking his head at inappropriate times'"); <u>United States</u> v. <u>Biaggi</u>, 853 F.2d 89, 96 (2d Cir. 1988) (upholding challenge of jurors "display[ing] angry, arrogant, or flippant demeanors"), <u>cert. denied</u>, 489 U.S. 1052, 109 S. Ct. 1312 (1989); <u>United States</u> v. <u>Forbes</u>, 816 F.2d 1006, 1010 (5th Cir. 1987) (prosecutor sensed by juror's "posture and demeanor that she was hostile to being in court").

The prosecutor also stated that she challenged Brown because she "read detective stories" which, according to the prosecutor, meant she "might have an expectation of what should be part of a case." (<u>See</u> pages 5, 50-51 above.) The fear that a juror who watches television police programs (<u>e.g.</u>, "CSI") or reads detective novels may find the real life police and prosecutor's efforts to be deficient is a race neutral basis for a peremptory challenge. <u>United States</u> v. <u>Fields</u>, 483 F.3d 313, 355 n.39 (5th Cir. 2007) ("'The "CSI effect" is a term that legal authorities and the mass media have coined to describe a supposed influence that watching the television show <u>CSI: Crime Scene Investigation</u> has on juror behavior. Some have claimed that jurors who see the high-quality forensic evidence presented on CSI raise their standards in real trials, in which actual evidence is typically more flawed and uncertain.'"), <u>cert. denied</u>, --- S. Ct. ----, 2008 WL 114089 (Jan. 14, 2008); <u>see</u>, <u>e.g.</u>, <u>Rose</u> v. <u>Senkowski</u>, No. 99 CV 6053, 2005 WL 4655394 at *16 (E.D.N.Y. July 25, 2005) (upholding prosecutor's striking venireperson "because she read mystery novels and thus may have gone into the jury room and 'played detective.'"), <u>report & rec. adopted</u>, 2006 WL 1720445 (E.D.N.Y. Jun. 22,

2006); cf. United States v. Sandoval, No. 94 CR 714, 1997 WL 656211 at *3 & nn.7-8 (N.D. Ill. Oct. 14, 1997) (No pretext where prosecutor struck minority "poorly educated jurors" even though prosecutor "did not strike three other jurors with high school educations because they read mystery novels and watched new[s] shows" which suggested to the prosecutor that "they would be able to grasp the evidence.").  A notable difference here that Wells has pointed out is that the prosecutor did not strike other members of the venire who responded that they read as a hobby nor even question them as to what type of reading they enjoyed.  (See pages 36, 37-38, 53 above.)  The uneven application of a facially race-neutral explanation does not, by itself, necessarily establish the invalidity of the explanation.  See, e.g., United States v. Novaton, 271 F.3d 968, 1004 (11th Cir. 2001), cert. denied, 535 U.S. 1120, 122 S. Ct. 2345 (2002); Matthews v. Evatt, 105 F.3d 907, 918 (4th Cir.) ("Batson is not violated whenever two veniremen of different races provide the same responses and one is excused and the other is not. . . . because counsel must be entitled to make credibility determinations in exercising peremptory challenges."), cert. denied, 522 U.S. 833, 118 S. Ct. 102 (1997); United States v. Spriggs, 102 F.3d 1245, 1255 (D.C. Cir.), cert. denied, 522 U.S. 831, 118 S. Ct. 97 (1997); United States v. Stewart, 65 F.3d 918, 926 (11th Cir. 1995) ("We recognize that failing to strike a white juror who shares some traits with a struck black juror does not itself automatically prove the existence of discrimination."), cert. denied, 516 U.S. 1134, 116 S. Ct. 958 (1996); United States v. Alvarado, 951 F.2d at 25 ("Decisions in other circuits have observed

that an explanation for a peremptory challenge, though weakened, is not automatically to be rejected

simply because it applies to a non-minority venireperson who was not challenged.").[31]

        However, as the Second Circuit has stated, "[t]he force of [counsel's] explanation for

challenging a minority member of a venire is obviously weakened substantially by evidence that non-

minority members to whom the same explanation applies were not challenged." United States v.

Alvarado, 951 F.2d at 25; accord, e.g., United States v. Thomas, 320 F.3d 315, 318 (2d Cir. 2003)

("'. . . Support for the notion that there was purposeful discrimination in the peremptory challenge

may lie in the similarity between the characteristics of jurors struck and jurors accepted.  Where the

principal difference between them is race, the credibility of the [attorney exercising the peremptory]

explanation is much weakened.'"); Jordan v. Lefevre, 293 F.3d at 587, 594 (2d Cir. 2002) ("'The

relative plausibility or implausibility of each explanation for a particular challenge, assessed in light

of the prosecution's acceptance of jurors with similar circumstances, may strengthen or weaken the

assessment of the prosecution's explanation as to other challenges and thereby assist the fact-finder

in determining overall intent.'") (quoting United States v. Alvarado, 923 F.2d 253, 256 (2d Cir.

1991)); Jordan v. Lefevre, 206 F.3d 196, 201 (2d Cir. 2000); Roman v. Abrams, 822 F.2d 214, 228

(2d Cir. 1987) (upholding district court's finding that prosecutor's reasons for striking jurors were

---

[31]    See also, e.g., Holder v. Welborn, 60 F.3d 383, 390 (7th Cir. 1995); Burks v. Borg, 27 F.3d 1424, 1429 (9th Cir. 1994), cert. denied, 513 U.S. 1160, 115 S. Ct. 1122 (1995); United States v. Valley, 928 F.2d 130, 136 (5th Cir. 1991); United States v. Lance, 853 F.2d 1177, 1181 (5th Cir. 1988); United States v. McCoy, 848 F.2d 743, 745 (6th Cir. 1988); Rodriguez v. Senkowski, 03 Civ. 3314, 2004 WL 503451 at *36 (S.D.N.Y. Mar. 15, 2004) (Peck, M.J.); Besser v. Walsh, 2003 WL 22093477 at *28; Owens v. Portuondo, 1999 WL 378343 at *11.

pretextual where, inter alia, only exercised against white jurors with that characteristic but not against non-white jurors with similar characteristic), cert. denied, 489 U.S. 1052, 109 S. Ct. 1311 (1989); Haywood v. Portuando, 288 F. Supp. 2d 446, 461 (S.D.N.Y. 2003) ("Courts have routinely held that when characteristics are shared by excused members of the venire and those ultimately chosen to serve--and the only difference between them is race--the trial judge may rightly consider that fact as evidence of a pretext.") (citing cases); Besser v. Walsh, 2003 WL 22093477 at *28; People v. Rodriguez, 211 A.D.2d 275, 279-80, 627 N.Y.S.2d 614, 617-8 (1st Dep't 1995) ("One of the significant factors to be considered in determining whether a race-neutral explanation is non-pretextual is whether it has been applied consistently to all prospective jurors, whether or not they are members of the protected group."), appeal dismissed, 88 N.Y.2d 917, 646 N.Y.S.2d 982 (1996).[32]

    In the present case, the overall circumstances undercut any inference of discrimination. Although Brown shared the characteristic of reading as a hobby with other white

----

[32]    See also, e.g., Davidson v. Harris, 30 F.3d 963, 965 (8th Cir. 1994) ("'[I]n this circuit, it is well established that [a litigant] may not justify peremptory challenges to venire members of one race unless venire members of another race with comparable or similar characteristics are also challenged.' . . . A party can establish an otherwise neutral explanation is pretextual by showing that the characteristics of a stricken black panel member are shared by white panel members who were not stricken."), cert. denied, 513 U.S. 1083, 115 S. Ct. 737 (1995); Walters v. Mitchell, No. 99-CV-2579, 2002 WL 1751400 at *4 (E.D.N.Y. July 18, 2002) ("If crime-victim status were a genuine reason to challenge juror eight, defense counsel could reasonably be expected to object to juror fourteen on this basis as well. By not consistently challenging jurors on the basis of crime victimization, defense counsel selectively applied a race-neutral factor. This unequal application suggests that defense counsel's explanation for striking juror eight was pretextual."); Owens v. Portuondo, 1999 WL 378343 at *11.

jurors who were not struck, there were other differences between the jurors.  Some of the other

venirepersons had volunteered that they read history, science fiction or things other than detective

stories.  (See pages 3-4 n.2 above.)  As to others who said they read, A.D.A. Schwartz's testimony,

that in later rounds there just was not time to question all the venirepersons about their reading, was

credible.  (See page 53 above.)  Moreover, as A.D.A. Schwartz testified, Brown's hostile and

unsettling demeanor was the primary reason for striking her, a trait not shared by the other general

readers. (See pages 54-55 above.)  Consequently, any inference of discrimination based on the single

shared characteristic can be undermined by other differences between the jurors. See, e.g., Matthews

v. Evatt, 105 F.3d at 918; Holder v. Welborn, 60 F.3d at 390; United States v. Alvarado, 951 F.2d

at 25 ("Decisions in other circuits have observed that an explanation for a peremptory challenge,

though weakened, is not automatically to be rejected simply because it applies to a non-minority

venireperson who was not challenged. . . . In these cases, however, the prosecutor had put forward

other reasons, in addition to the trait shared with the unchallenged jurors, which enhanced the

credibility of the prosecutor's explanation."); United States v. Valley, 928 F.2d at 136 (finding

prosecutor's explanation for striking black jurors, family member's criminal history, was not

pretextual even though it applied to white jurors who were not struck, where there were "race-neutral

differences" between struck and not struck jurors); United States v. Lance, 853 F.2d at 1181

("Although the prosecutor may have accepted a white juror with some characteristics similar to the

black persons he rejected, the prosecutor also gave reasons for his selection that we are unable to

evaluate, such as eye contact and demeanor."); United States v. McCoy, 848 F.2d at 745 ("[a]lthough

three white jurors who were not challenged also did not work, the prosecution could reasonably assume that they, a 63-year-old male, a 62-year-old male, and a 41-year-old married female, would not excessively sympathize with [defendant]" unlike the young black female unemployed juror who was struck); United States v. Lewis, 837 F.2d 415, 417 n.5 (9th Cir.) ("We recognize, however, that the decision whether to strike a venireman hinges upon the interplay of various factors and that no unchallenged juror possessed all the cited characteristics."), cert. denied, 488 U.S. 923, 109 S. Ct. 304 (1988); Owens v. Portuondo, 199 WL 378343 at *12.

The prosecutor also stated that she challenged Brown because she reminded the prosecutor "of Judge Cropper which made [the prosecutor] just somewhat anxious in a sort of an emotional way." (See page 5 above.) Wells contends that there could be no reason other than race for this explanation to the challenge. (See page 37 above.) However, during the reconstruction hearing, A.D.A. Schwartz explained that it was Brown's attitudinal similarity to Justice Cropper, and A.D.A. Schwartz's negative experience during a prior trial before Justice Cropper, and not race, that caused her to strike Brown. (See pages 50-55 above.) The Court found A.D.A. Schwartz's testimony at the reconstruction hearing on this subject to be candid and credible. (See page 55 above.)

The Court recognizes that a reason found to be race-neutral in one case can be a pretext for discrimination in another. See, e.g., Minetos v. City Univ. of New York, 925 F. Supp. 177, 184-85 (S.D.N.Y. 1996) (Motley, D.J.) (after discussing which grounds have withstood Batson challenges, notes that "listing in this manner has the unfortunate effect of creating a how-to guide

for defeating <u>Batson</u> challenges.  Such guidelines do not ensure that juror strikes are not racially motivated - only that advocates are on notice of which reasons will best survive judicial review." Judge Motley therefore "call[ed] for an end to peremptory challenges and the racial discrimination they perpetuate.").  The burden, however, is on the person making the <u>Batson</u> challenge – here, Wells – to show discrimination.  Wells did not do so.  Wells claims that "[e]ven if Mr. Wells was required to make additional argument, the trial court did not afford Mr. Wells's counsel the opportunity to inquire further into the prosecutor's reasons for striking Ms. Brown or to make any additional arguments to create a proper record."  (<u>See</u> page 37 above.)  However, this Court's review of the voir dire transcript found no ruling depriving Wells of making a <u>Batson</u> record.  The burden was on Wells and he failed to carry it.  "'[W]here the opponent of the peremptory strikes makes no attempt to demonstrate pretext,' facially neutral reasons for exercising peremptory strikes will be upheld." <u>United States</u> v. <u>Gibson</u>, 105 F.3d at 1232.  Moreover, at the reconstruction hearing, the Court permitted Wells' habeas counsel to fully cross-examine A.D.A. Schwartz, and to call Wells' trial counsel (which did not occur), but Wells still was unable to show pretext.  Indeed, A.D.A. Schwartz's testimony at the reconstruction hearing was credible, and buttressed Justice Tejada's original decision denying Wells' <u>Batson</u> challenge.

Ultimately, step three of the <u>Batson</u> analysis requires that the totality of circumstances be considered.  <u>United States</u> v. <u>Alvarado</u>, 951 F.2d at 26 ("As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances."); <u>see also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Thomas</u>, 303 F.3d 138, 144 (2d Cir. 2002); <u>Galarza</u> v. <u>Keane</u>, 252 F.3d 630,

636 (2d Cir. 2001); <u>Jordan</u> v. <u>Lefevre</u>, 206 F.3d at 200 ("[T]he third step of the <u>Batson</u> inquiry

requires a trial judge to make 'an ultimate determination on the issue of discriminatory intent based

on all the facts and circumstances.'"); <u>United States</u> v. <u>Alvarado</u>, 923 F.2d at 256 (remanding for "an

ultimate determination on the issue of discriminatory intent based on all the facts and

circumstances"); <u>Rodriguez</u> v. <u>Senkowski</u>, 2004 WL 503451 at *37; <u>Besser</u> v. <u>Walsh</u>, 2003 WL

22093477 at *29; <u>United States</u> v. <u>Franklin</u>, S1 96 CR. 1062, 1997 WL 334969 at *5 (S.D.N.Y.

June 16, 1997), <u>aff'd</u>, 157 F.3d 90 (2d Cir.), <u>cert. denied</u>, 525 U.S. 1027, 119 S. Ct. 563 (1998);

<u>DeBerry</u> v. <u>Portuondo</u>, 277 F. Supp. 2d 150, 157 (E.D.N.Y. 2003), <u>aff'd</u>, 403 F.3d 57 (2d Cir.), <u>cert.</u>

<u>denied</u>, 546 U.S. 884, 126 S. Ct. 225 (2005); <u>Haywood</u> v. <u>Portuondo</u>, 288 F. Supp. 2d at 460; <u>Frazier</u>

v. <u>New York</u>, 187 F. Supp. 2d 102, 114 (S.D.N.Y. 2002), <u>aff'd</u>, 156 Fed. Appx. 423 (2d Cir. 2005).[33]

        As the Supreme Court has instructed:

> [T]he critical question in determining whether a prisoner has proved purposeful
> discrimination at step three is the persuasiveness of the prosecutor's justification for
> his peremptory strike. At this stage, "implausible or fantastic justifications may (and
> probably will) be found to be pretexts for purposeful discrimination." <u>Ibid</u>. In that
> instance the issue comes down to whether the trial court finds the prosecutor's race-

---

[33]      <u>See also</u>, <u>e.g.</u>, <u>United States</u> v. <u>Hill</u>, 146 F.3d 337, 342 (6th Cir. 1998) ("At [the third] step
of the analysis, the [trial] court has the responsibility to assess the prosecutor's credibility
under all of the pertinent circumstances, and then to weigh the asserted justification against
the strength of the defendant's prima facie case under the totality of the circumstances.");
<u>United States</u> v. <u>Stewart</u>, 65 F.3d at 923 (at the third stage, "'the trial judge determines, in
light of all the facts and circumstances, whether the [<u>Batson</u> challenger] has established the
existence of purposeful discrimination'"); <u>United States</u> v. <u>Maseratti</u>, 1 F.3d 330, 335 (5th
Cir. 1993) ("The court must then determine, in light of all of the facts and circumstances,
whether the defendant has carried his burden to establish purposeful discrimination."), <u>cert.</u>
<u>denied</u>, 510 U.S. 1129, 114 S. Ct. 1096 (1994); <u>United States</u> v. <u>Mitchell</u>, 877 F.2d 294, 303
(4th Cir. 1989); <u>Owens</u> v. <u>Portuondo</u>, 1999 WL 378343 at *12.

neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.

Miller-El v. Cockrell, 537 U.S. 322, 338, 123 S. Ct. 1029, 1040 (2003); see also, e.g., McKinney v. Artuz, 326 F.3d at 98 ("Thus, [i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. Because the evidence on this issue is often vague or ambiguous, the best evidence often will be the demeanor of the attorney who exercises the challenge.  Thus, evaluation of the [striking attorney's] state of mind based on [his or her] demeanor and credibility lies peculiarly within a trial judge's province.") (internal quotations & citations omitted, brackets in original); Rodriguez v. Senkowski, 2004 WL 503451 at *37; Besser v. Walsh, 2003 WL 22093477 at *29.

Because the trial court is in the best position to observe the demeanor and assess the credibility of the attorney exercising the peremptory challenge, Miller-El v. Cockrell, 537 U.S. at 348, 123 S. Ct. at 1041 ("Deference is necessary because a reviewing court, which analyzes only the transcript from voir dire, is not as well positioned as the trial court is to make credibility determinations."); Hernandez v. New York, 500 U.S. at 365, 111 S. Ct. at 1869; McKinney v. Artuz, 326 F.3d at 99, the trial court's factual determinations are to be accorded "great deference," Hernandez v. New York, 500 U.S. at 364, 111 S. Ct. at 1868; Batson, 476 U.S. at 98 n.21, 106 S. Ct. at 1724 n.21.  "To secure habeas relief [under Batson], petitioner must demonstrate that a state court's finding of the absence of purposeful discrimination was incorrect by clear and convincing evidence, 28 U.S.C. § 2254(e)(1), and that the corresponding factual determination was 'objectively

unreasonable' in light of the record before the court." Miller-El v. Cockrell, 537 U.S. at 348, 123

S. Ct. at 1045; accord, e.g., McKinney v. Artuz, 326 F.3d at 101 ("In the context of a habeas

application from a state prisoner . . . , 'a determination of a factual issue made by a State court shall

be presumed to be correct,' 28 U.S.C. § 2254(e)(1), and the petitioner bears the burden of rebutting

the presumption by clear and convincing evidence, id."); Bryant v. Speckard, 131 F.3d at 1077 ("A

state court's determination whether [an attorney's] use of a peremptory challenge was motivated by

discriminatory intent, in violation of Batson, is a factual determination and thus qualifies for th[e]

presumption of correctness [under 28 U.S.C. § 2254(d)]."); Rodriguez v. Senkowski, 2004 WL

503451 at *37; Besser v. Walsh, 2003 WL 22093477 at *29.

        Here, Justice Tejada had a full opportunity to consider all relevant facts, and his

finding that there was a race-neutral basis for the prosecutor's peremptory challenge of Brown was

consistent with those facts. Justice Tejada, of course, had the opportunity to view the prosecutor's

demeanor and determine her credibility at the time of jury selection. This Court also had an

opportunity at the reconstruction hearing, albeit six and one-half years after the trial, to determine

the prosecutor's credibility, and this Court finds that A.D.A. Schwartz's race-neutral explanations

were plausible and her testimony was credible. Examining the record as a whole and A.D.A.

Schwartz's explanations for her challenge to Brown, and extending the requisite deference to Justice

Tejada's evaluation of A.D.A. Schwartz's credibility, and independently finding at the reconstruction

hearing that A.D.A. Schwartz's explanations were credible, the Court finds that Wells has not

rebutted the presumption of correctness accorded the trial court's finding of non-pretext by clear and

convincing evidence.  Accordingly, this Court cannot say that, under that standard, Wells is entitled to habeas corpus relief.  Wells' <u>Batson</u> habeas claim should be <u>DENIED</u>.

### III.    WELLS' TAINTED VENIRE PANEL CLAIM LACKS MERIT

#### A.    Wells' Claim

Wells asserts that his "Sixth Amendment right to be tried before a fair and impartial jury was violated by the trial court's refusal to strike a newly-seated jury panel after a prospective juror [Marcus Smalls] attested to the credibility of a key prosecution witness before the panel, from which jurors and alternates were ultimately chosen."  (Dkt. No. 2: Pet. ¶ 21.)

Wells elaborated that:

22.  The court's second question to a newly-seated jury panel was whether any prospective jurors knew any person on a list of individuals involved in the case.  One person on the list was Detective Eddie Molina, a key prosecution witness whose credibility was crucial to the case against Mr. Wells.

23.  Before the entire panel, a prospective juror stated that he was "good friends" with Detective Molina and could not be impartial to the case because Detective Molina was "an honest guy."

24.  Mr. Wells's counsel immediately moved to have the panel stricken, and the court refused.

25.  Although the court initially refused to grant the prosecution's request for a cautionary instruction, the court later gave a vague instruction and asked a few generic questions.

26.  Two jurors and three alternates were chosen from this panel.

27.  At trial, Detective Molina provided testimony that linked Mr. Wells with the crimes with which he was charged.  Discrediting Detective Molina's credibility was the defense's strategy, and was addressed by the defense in its opening and closing statements.

(Pet. ¶¶ 22-27, record citations omitted.)

Wells asserts that "[t]here is nothing more prejudicial to a criminal defendant than the improper bolstering of the credibility of a critical police eyewitness before the trial has even begun.  It is particularly prejudicial in this case because the very heart of the defense was that the police testimony was contrived." (Dkt. No. 3: Wells Br. at 28-29.)  Wells also claims that "[t]he trial court's attempts to rectify the matter with a generic and untimely instruction and questions were too little, too late," the "minimal efforts were insufficient to purge the taint from this panel," and the "venire's lack of response to the judge's questions falls far short of an unequivocal assurance of impartiality."  (Wells Br. at 31-32.)

### B.    Legal Standards

The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors."  Irvin v. Dowd, 366 U.S. 717, 722, 81 S. Ct. 1639, 1642 (1961); accord, e.g., Murphy v. Florida, 421 U.S. 794, 799, 95 S. Ct. 2031, 2036 (1975); United States v. Torres, 128 F.3d 38, 42 (2d Cir. 1997), cert. denied, 523 U.S. 1065, 118 S. Ct. 1399 (1998).  However, as the Supreme Court has explained:

> [D]ue process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable.  The safeguards of juror impartiality, such as voir dire and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.  Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

Smith v. Phillips, 455 U.S. 209, 217, 102 S. Ct. 940, 946 (1982) (emphasis added).  "'[T]he Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula'" to attain juror impartiality or indifference. United States v. Torres, 128 F.3d at 43 (quoting United States v. Wood, 299 U.S. 123, 145-46, 57 S. Ct. 177, 185 (1936)).[34/]  Instead, "in each case a broad discretion and duty reside in the [trial] court to see that the jury as finally selected is subject to no solid basis of objection on the score of impartiality . . . ."  Frazier v. United States, 335 U.S. 497, 511, 69 S. Ct. 201, 209 (1948); accord, e.g., Rosales-Lopez v. United States, 451 U.S. 182, 188-89, 101 S. Ct. 1629, 1634 (1981); United States v. Small, 423 F.3d 1164, 1180 (10th Cir. 2005), cert. denied, 546 U.S. 1190, 126 S. Ct. 1377 (2006); United States v. Torres, 128 F.3d at 43.

The trial judge has broad discretion in the questioning of potential jurors during voir dire.  See, e.g., Mu'Min v. Virginia, 500 U.S. 415, 423-24, 111 S. Ct. 1899, 1904 (1991); United States v. Torres, 128 F.3d at 43; United States v. Small, 423 F.3d at 1180; United States v. Tegzes, 715 F.2d 505, 507 (11th Cir. 1983); United States v. Brooks, 670 F.2d 148, 152 (11th Cir.), cert. denied, 457 U.S. 1124, 102 S. Ct. 2943 (1982); United States v. Gibbons, 607 F.2d 1320, 1330 (10th Cir. 1979).  Moreover, "[t]he trial court, when impaneling a jury, 'has . . . broad discretion in its rulings on challenges'" for bias.  United States v. Haynes, 398 F.2d 980, 984 (2d Cir. 1968), cert. denied, 393 U.S. 1120, 89 S. Ct. 996 (1969); see also, e.g., United States v. Torres, 128 F.3d at 44;

---

[34/]    The Second Circuit "has consistently refused to create a set of unreasonably constricting presumptions that jurors be excused for cause due to certain occupational or other special relationships which might bear directly or indirectly on the circumstances of a given case, where . . . there is no showing of actual bias or prejudice." United States v. Torres, 128 F.3d at 46 (quotations omitted).

United States v. Jones, 696 F.2d 479, 492 (7th Cir. 1982) ("The decision whether to dismiss any or all jurors lies in the sound discretion of the trial judge."), cert. denied, 462 U.S. 1106, 103 S. Ct. 2453 (1983).

        The trial judge is accorded such broad discretion because a finding of actual bias "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." Wainwright v. Witt, 469 U.S. 412, 428, 105 S. Ct. 844, 854 (1985); see also, e.g., Mu'Min v. Virginia, 500 U.S. at 424, 111 S. Ct. at 1904; Patton v. Yount, 467 U.S. 1025, 1038, 104 S. Ct. 2885, 2892 (1984) (noting that a trial judge's determination of actual bias "is essentially one of credibility, and therefore largely one of demeanor," and, as such, is entitled to special deference); United States v. Torres, 128 F.3d at 44; United States v. Ploof, 464 F.2d 116, 118 (2d Cir.) ("[T]he judge was in the best position to evaluate the juror's demeanor and to determine, by the juror's answers to the judge's questions, whether he could fairly and impartially hear the case and return a verdict based solely on the evidence presented in court."), cert. denied, 409 U.S. 952, 93 S. Ct. 298 (1972).

        "Given the special capacity of the trial judge to evaluate actual bias on the part of prospective jurors, that judge's determination in this regard is accorded great deference, since 'an appellate court [cannot] easily second-guess the conclusions of the decisionmaker who heard and observed the witnesses.'" United States v. Torres, 128 F.3d at 44 (quoting Rosales-Lopez v. United States, 451 U.S. at 188, 101 S. Ct. at 1634); see also, e.g., Wainwright v. Witt, 469 U.S. at 428, 105 S. Ct. at 854; United States v. Garcia, 936 F.2d 648, 653 (2d Cir.), cert. denied, 502 U.S. 986, 112

S. Ct. 595 (1991); United States v. Ferri, 778 F.2d 985, 994 (3d Cir. 1985), cert. denied, 476 U.S.

1172, 106 S. Ct. 2896 (1986); United States v. Gibbons, 607 F.2d 1320, 1330 (10th Cir. 1979);

United States v. Ploof, 464 F.2d at 118 n.4 ("There are few aspects of a jury trial where we would

be less inclined to disturb a trial judge's exercise of discretion, absent clear abuse, than in ruling on

challenges for cause in the empanelling of a jury.  Indeed the entire voir dire procedure in the

empanelling of a jury, by its nature, is one best left to the sound discretion of the [trial] judge.").

> Moreover, jurors are presumed to be impartial.  As the Supreme Court explained,

> To hold that the mere existence of any preconceived notion as to the guilt or
> innocence of an accused, without more, is sufficient to rebut the presumption of a
> prospective juror's impartiality would be to establish an impossible standard.  It is
> sufficient if the juror can lay aside his impression or opinion and render a verdict
> based on the evidence presented in court.

Irvin v. Dowd, 366 U.S. at 723, 81 S. Ct. at 1642-43.

> Finally, in this area as in all others, the jurors (or potential jurors) are presumed to

follow the court's instructions.  See, e.g., Penry v. Johnson, 532 U.S. 782, 799, 121 S. Ct. 1910, 1922

(2001) (citing Richardson v. Marsh, 481 U.S. 200, 211, 107 S. Ct. 1702, 1709 (1987)); Lucero v.

Kerby, 133 F.3d 1299, 1309 (10th Cir.) (Petitioner "failed to establish a presumption of prejudice"

where potential juror removed but panel not struck.  "'Absent evidence to the contrary, we presume

that jurors remain true to their oath and conscientiously observe the instructions and admonitions of

the court.'"), cert. denied, 523 U.S. 1110, 118 S. Ct. 1684 (1998); Del Pilar v. Phillips, 03 Civ. 8636,

2004 WL 1627220 at *12 n.27 (S.D.N.Y. July 21, 2004) (Peck, M.J.) (& cases cited therein), report & rec. adopted, 2006 WL 3735684 (S.D.N.Y. Dec. 15, 2006).[35/]

C.    **Application to Well's Claims**

Wells relies on the Ninth Circuit's grant of habeas relief in Mach v. Stewart, 137 F.3d 630, 634 (9th Cir. 1997), and claims that Smalls' statements "were even more prejudicial" than those in Mach because "Smalls spoke from his own personal experience about a key individual testifying against Mr. Wells," while in Mach the potential juror made "merely a generalization about unrelated

---

[35/]    See also, e.g., United States v. Khoury, 901 F.2d 948, 955 (11th Cir. 1990) (During voir dire, "[t]he juror subsequently began to cry in the presence of the rest of the panel, and defense counsel moved to strike the entire panel because of the prejudicial impact of her statements. The court, although striking the juror for cause, refused to strike the entire panel, and instructed the remaining jurors that the statements made during voir dire were not evidence and had 'nothing to do with the case . . . .' . . . . The jurors in this case took their oath, and absent evidence to the contrary, we must presume that they were fair and impartial, as indeed they swore to be."); Murray v. Greene, 06 Civ. 3677, 2006 WL 3751294 at *17 (S.D.N.Y. Dec. 21, 2006) (Peck, M.J.); Llanos v. Goord, 06 Civ. 0261, 2006 WL 1981749 at *18 (S.D.N.Y. July 14, 2006) (Peck, M.J.); A.S. Goldmen, Inc. v. Phillips, 05 Civ. 4385, 05 Civ. 5496, 2006 WL 1881146 at *32-33 (S.D.N.Y. July 6, 2006) (Peck, M.J.), report & rec. adopted, 2007 WL 2994453 (S.D.N.Y. Oct. 15, 2007); Rosario v. Walsh, 05 Civ. 2684, 2006 WL 1431410 at *23 (S.D.N.Y. May 25, 2006) (Peck, M.J.), report & rec. adopted, 2006 WL 1880958 (S.D.N.Y. July 5, 2006); Murray v. Schultz, 05 Civ. 0472, 2005 WL 1523504 at *16 (S.D.N.Y. June 29, 2005) (Peck, M.J.); Roman v. Filion, 04 Civ. 8022, 2005 WL 1383167 at *21 (June 10, 2005) (Peck, M.J.); Yapor v. Mazzuca, 04 Civ. 7966, 2005 WL 894918 at *15 & n.33 (S.D.N.Y. Apr. 19, 2005) (Peck, M.J.), report & rec. adopted, 2005 WL 1845089 (S.D.N.Y. Aug. 3, 2005); James v. Artus, 03 Civ. 7612, 2005 WL 859245 at *12 (S.D.N.Y. Apr. 15, 2005) (Peck, M.J.); Kanani v. Phillips, 03 Civ. 2534, 2004 WL 2296128 at *19 & n.31 (S.D.N.Y. Oct. 13, 2004) (Peck, M.J.), report & rec. adopted, 2005 WL 2431416 (S.D.N.Y. Oct. 3, 2005); Smalls v. McGinnis, 04 Civ. 0301, 2004 WL 1774578 at *24 (S.D.N.Y. Aug. 10, 2004) (Peck, M.J.).

74

sexual assault cases with which she had experience."  (Dkt. No. 3: Wells Br. at 30; see Dkt. No. 10:

Wells Reply Br. at 11-12.)

Mach was charged with sexual conduct with a minor.  Mach v. Stewart, 137 F.3d at

631.  A prospective juror who was a social worker stated that "she would have a difficult time being

impartial given her line of work, and that sexual assault had been confirmed in every case in which

one of her clients reported such an assault."  Mach v. Stewart, 137 F.3d at 632.  The state trial judge

further questioned the prospective juror and elicited other statements such as "that she had never, in

three years in her position, become aware of a case in which a child had lied about being sexually

assaulted."  Id.  In addition, the prospective juror stated that she had taken psychology courses and

had worked extensively with psychologists and psychiatrists.  Id.  The trial judge struck the

prospective juror for cause, but denied Mach's request to declare a mistrial.  Id.  The Ninth Circuit

granted habeas relief, holding that "[a]t a minimum, when Mach moved for a mistrial, the court

should have conducted further voir dire to determine whether the panel had in fact been infected by

[the prospective juror's] expert-like statements."  Mach v. Stewart, 137 F.3d at 633.  Moreover, the

Ninth Circuit held that the potential juror's statement "was highly inflammatory and directly

connected to Mach's guilt."  Mach v. Stewart, 137 F.3d at 634.

Mach has never been followed, or even cited approvingly, by the Second Circuit or

district courts within the Circuit.[36/]  Indeed, Mach is sui generis.  In United States v. Guzman, 450

---

[36/]     One case within the Second Circuit distinguishes Mach.  See Flores v. Keane, 211 F. Supp.
2d 426, 444 (S.D.N.Y. June 13, 2001) (Petitioner objected that "'questioning [a prospective
(continued...)

F.3d 627, 631 (6th Cir. 2006) (fn. omitted), <u>cert. denied</u>, 127 S. Ct. 1160 (2007), the Sixth Circuit

noted that it had "found only one case where comments by potential jurors not directly related to the

defendant in the case at bar rose to the level of presumed prejudicial error," citing <u>Mach</u>, and also

proceeded to factually distinguish <u>Mach</u>.  The <u>Guzman</u> Court held that "[c]ritical to the ruling in

<u>Mach</u> was the 'expert-like' nature of the [juror's] statements . . . [that] were 'highly inflammatory and

directly connected to [the defendant's] guilt.'"  <u>United States</u> v. <u>Guzman</u>, 450 F.3d at 627.  Here, as

in <u>Guzman</u> and unlike <u>Mach</u>, Smalls' comments were neither inflammatory nor expert-like, but

merely the opinion of a friend.  (<u>See</u> pages 8-9 above.)  Moreover, in <u>Guzman</u> and here, the trial

judge asked the venire if they were affected by the comments, and none said that they were affected.

(<u>See</u> page 10 above.)  <u>United States</u> v. <u>Guzman</u>, 450 F.3d at 632 (Trial judge "here asked every juror

whether there was any reason that he or she would be unable to be impartial and decide the case

solely on the evidence presented, and . . . every juror in this case affirmed an ability to remain

fair.").[37]

---

[36]     (...continued)
         juror] in open court amounted to a denial of an impartial jury' because this juror's comments
         'prejudiced the panel,'" but the Court held that <u>Mach</u> was "clearly distinguishable.").

[37]     The <u>Mach</u> court found similar instructions/questions insufficient because of repeated
         statements by the potential juror.  <u>Mach</u> v. <u>Stewart</u>, 137 F.3d at 633 ("At a minimum, when
         Mach moved for a mistrial, the court should have conducted further voir dire to determine
         whether the panel had in fact been infected by [the venireperson's] expert-like statements.
         Given the nature of [the] statements, the certainty with which they were delivered, the years
         of experience that led to them, and the number of times that they were repeated, we presume
         that at least one juror was tainted and entered into jury deliberations with the conviction that
         children simply never lie about being sexually abused.").

The Eighth Circuit also rejected Mach, in United States v. Lussier, 423 F.3d 838, 842

(8th Cir. 2005), cert. denied, 546 U.S. 1130, 126 S. Ct. 1120 (2006).  In Lussier, a prospective juror

said he knew Lussier's only witness, called the witness a "neighborhood nuisance," and said that he

would have problems with the witness' credibility.  United States v. Lussier, 423 F.3d at 840.  The

trial court denied Lussier's motion to strike the jury panel based on those comments.  Id.  On appeal,

the Eighth Circuit declined Lussier's request to apply Mach, finding the potential juror's statements

were neither expert-like nor inflammatory:

> We are not persuaded to apply Mach in this circuit on these facts.  In this
> case, the prospective juror's remarks neither charged Lussier with a crime, nor had
> a bearing on Lussier's guilt of the crime charged.  In fact, the remarks did not pertain
> to Lussier at all, as they referred only to [Lussier's witness].  While the statements
> could affect [the witness'] credibility, they were neither expert-like nor highly
> inflammatory.  The district court gave Lussier the option of several curative
> measures, and Lussier's counsel agreed to address the issue in jury instructions, and
> rejected other measures as "cures worse than the disease."  As a result, the court
> instructed the jury that any thing said during jury selection was not evidence in the
> case.  The district court did not abuse its discretion in refusing Lussier's request for
> a mistrial.

United States v. Lussier, 423 F.3d at 842; see also, e.g., United States v. Uriarte-Perez, No. 97-

50579, 164 F.3d 632 (table), 1998 WL 704102 at *1 (9th Cir. Oct. 5, 1998) ("Defendant relies on

Mach v. Stewart, . . . but Dubin's statement was much less prejudicial than that of the social worker

in Mach, the social worker's expertise was better established, Dubin expressed an opinion on a

subject within the experience of the other venire members (i.e., whether guilty people sometimes

proclaim their innocence), he made only one comment, and he was immediately excused for cause.

In light of these differences, we cannot presume, as the court could in <u>Mach</u>, that any juror was tainted by Dubin's comments.") (record citation omitted).[38/]

Wells' briefs did not cite, nor did this Court's research reveal, any case other than <u>Mach</u>  supporting the dismissal of an entire voir dire panel due to a potential juror's remarks unrelated to the defendant.  In fact, the case law holds that the disqualification of an individual juror for the expression of an opinion, or for making remarks indicating bias, does not constitute a sufficient ground for a challenge of the entire panel.  <u>See</u>, <u>e.g.</u>, <u>Reynolds</u> v. <u>Bagley</u>, 498 F.3d 549, 555-56 (6th Cir. 2007) (statements by a prospective juror who was a police officer that he had always found "completely truthful" a detective to be called as a witness and that the prosecutor was "efficient" and demanded a lot before moving forward with a prosecution, did not unconstitutionally taint the jury venire because "[a]lthough [the potential juror's] statements could *theoretically* have biased ultimately-seated jurors in favor of the prosecution and its witnesses, [petitioner] has failed to show that there was any *actual* bias, especially given the trial judge's subsequent curative instruction that jurors would have to decide the case for themselves.") (emphasis in original); <u>United States</u> v. <u>Lott</u>, 442 F.3d 981, 983-84 (7th Cir. 2006) (District court did not abuse its discretion by not dismissing the jury panel after a prospective juror stated he knew the arresting officer, that "they had

---

[38/]    The Court notes that both <u>Lussier</u> and <u>Guzman</u> were direct appeals, where the appeals courts can exercise supervisory power over district court proceedings.  The Sixth Circuit in <u>Guzman</u> noted that if a per se rule that a venireperson's comments taint the entire panel were adopted, "a per se rule would effectively require in camera voir dire of every potential juror in every criminal case . . . . to prevent the risk of complete venire contamination from innocent, extraneous remarks.  Such a requirement would cripple the trial process."  <u>United States</u> v. <u>Guzman</u>, 450 F.3d at 632.

worked together for over 20 years," and referred to the officer as "'a very honorable man.'"  "More

importantly, the district court questioned the remaining potential jurors about their ability to remain

impartial after [the venireperson] made his comments.  The venire members affirmed to the court

their ability to remain impartial, and [defendant] has presented no evidence that calls into question

the truth of their statements."); Lucero v. Kerby, 133 F.3d 1299, 1307-08 (10th Cir.) (The right to

an impartial jury was not violated when the trial court denied petitioner's motion to dismiss venire

panel on the ground that the venire members were irreparably tainted by their association during jury

qualification with a panel member who was the brother of one of the victims, and none of the jurors

answered affirmatively when asked if their ability to decide the case solely on the evidence presented

at trial was impaired; no actual prejudice shown and facts do not justify a presumption of prejudice.),

cert. denied, 523 U.S. 1110, 118 S. Ct. 1684 (1998); United States v. Wey, 895 F.2d 429, 431 (7th

Cir.) (prospective juror's remark that he would have trouble deciding the case impartially because

of a negative experience he had parallel with the charges against Wey, did not "contaminate" entire

panel because the prospective juror had not expressed a view on the merits of the case but merely

about a personal experience which paralleled the charges against the defendant, and "[n]o other juror

expressed doubt about ability to decide impartially."), cert. denied, 497 U.S. 1029, 110 S. Ct. 3283

(1990); United States ex rel. Brown v. Smith, 306 F.2d 596, 603 (2d Cir. 1962) ("[W]e find nothing

in what transpired during the questioning of the jurors which could have induced prejudice in any

juror who heard it; the mere awareness that some of their fellows had such prejudice as to require

that they be excused cannot realistically be said to disqualify the jurors finally selected."), cert.

denied, 372 U.S. 959, 83 S. Ct. 1012 (1963); Henry v. Beyer, Civ. A. No. 90-4199, 1991 WL 87582 at *6 (D.N.J. May 17, 1991) (the panel was not tainted by a potential juror's mistaken comment during voir dire that he had been involved in an altercation with the defendant).

Furthermore, Justice Tejada specifically asked the panel whether any statements made by other prospective jurors would affect their ability to be fair and impartial; no juror responded affirmatively. Justice Tejada was not obligated to question each panel member individually or to give any specific instructions regarding Smalls' comments, especially in the absence of any specific request for same by Wells' trial counsel. See the cases cited in the prior paragraph; see also, e.g., United States v. Guzman, 450 F.3d at 632 n.4 (citing Tegzes, infra, for proposition that "special jury instruction regarding a potential juror's biased statements" not required where judge fears "that such an instruction would cause to jurors to consider an issue that would not otherwise have been on their minds."); United States v. Small, 423 F.3d 1164, 1180 (10th Cir. 2005) ("Nor did the district court abuse its discretion in declining to question the other members of the panel. Although this court has sometimes cited the district court's questioning of the remaining panel as a factor to consider in deciding whether the district court abused its discretion, it has never required such questioning after every potentially prejudicial statement. Defense counsel in this case did not request questioning of the individual panel members, and expressed a desire to avoid highlighting the exchange to the rest of the panel.") (citations omitted), cert. denied, 546 U.S. 1190, 126 S. Ct. 1377 (2006); United States v. McKissick, 204 F.3d 1282, 1299-300 (10th Cir. 2000) (the court's cautionary instruction was sufficient to cure any possible prejudice resulting from the remarks of a venire person); United States

H:\ORD\WELLS-Terence

v. Tegzes, 715 F.2d 505, 507 (11th Cir. 1983) (the potential juror's "remark does not raise the spectre of potential prejudice in other jurors that would require the court to ask additional questions of the panel.  The statement did not constitute an opinion concerning the guilt or innocence of the defendants, nor did it relate to knowledge about the facts, parties, or witnesses involved in this case. . . . There is no reason to believe that any juror who was tainted by the [potential juror's] remark also would not have informed the court about any prejudice created by anything they heard during voir dire."); United States v. Delval, 600 F.2d 1098, 1100, 1103 (5th Cir. 1979) (The district court did not abuse its discretion when it declined to quash the entire venire or individually question prospective jurors, "fearing, with regard to the latter suggestion, that the effort to uncover any possible taint could itself give rise to prejudice where none had previously existed."); United States v. Perry, 550 F.2d 524, 528 (9th Cir.) (The trial judge "is best able to walk that fine line between first questioning the jury to find bias and then later specifically requestioning the jury to the extent that confusion and bias are created in the jury by suggesting the existence of controversial issues which may or may not exist."), cert. denied, 434 U.S. 827, 98 S. Ct. 104 (1977).

Finally, absent any reason to suspect that the potential jurors' responses to Justice Tejada's questions were untrue, the courts must credit them.  See, e.g., Dennis v. United States, 339 U.S. 162, 171, 70 S. Ct. 519, 523 (1950) ("[S]urely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter."); United States v. Trujillo, 146 F.3d 838, 843 (11th Cir. 1998) ("We hold that the district court did not abuse its discretion in failing to strike the entire jury panel or grant a mistrial. . . . [V]oir

dire examination detected no jury bias as a result of [potential juror's] comments.  Once the jurors took their oath, and 'absent evidence to the contrary, we must presume that they were fair and impartial, as indeed they were sworn to be.'"); United States v. Tegzes, 715 F.2d at 508 ("There is no reason to believe that any juror who was tainted by [the prospective juror's] remark also would not have informed the court about any prejudice created by anything they heard during voir dire.").

The Court's focus must be on the impartiality of the jury that actually sat, not on Smalls, who was struck.  See, e.g., Ross v. Oklahoma, 487 U.S. 81, 86, 108 S. Ct. 2273, 2277 (1988).  What Justice Tejada had to decide was whether Smalls' statement about Det. Molina's credibility irreparably tainted the remainder of the jury panel and destroyed their ability to remain fair and impartial.  In response to Justice Tejada's question as to whether any juror's comments affected their ability to be fair and impartial, none of the potential jurors responded affirmatively, and Wells presented no evidence that calls into question their impartiality.

The decisions on this issue by the New York Court of Appeals (and by the First Department and Justice Tejada) were not contrary to or an unreasonable application of Supreme Court precedent.[39]

Wells' tainted venire habeas claim has no merit and should be DENIED.

---

[39]    Wells' reliance on Mach is misplaced for this further reason.  Mach is not a Supreme Court precedent.  Thus, even if the state court decisions here were contrary to Mach, which they are not (see pages 15-21 above), that would not entitle Wells to habeas relief under the AEDPA review standard.

82

## CONCLUSION

For the reasons set forth above, Wells' habeas petition should be <u>DENIED</u> and a certificate of appealability should not be issued.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. <u>See also</u> Fed. R. Civ. P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Colleen McMahon, 500 Pearl Street, Room 640, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge McMahon (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. <u>Thomas</u> v. <u>Arn</u>, 474 U.S. 140, 106 S. Ct. 466 (1985); <u>IUE AFL-CIO Pension Fund</u> v. <u>Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993), <u>cert. denied</u>, 513 U.S. 822, 115 S. Ct. 86 (1994); <u>Roldan</u> v. <u>Racette</u>, 984 F.2d 85, 89 (2d Cir. 1993); <u>Frank</u> v. <u>Johnson</u>, 968 F.2d 298, 300 (2d Cir.), <u>cert. denied</u>, 506 U.S. 1038, 113 S. Ct. 825 (1992); <u>Small</u> v. <u>Sec'y of Health & Human Servs.</u>, 892 F.2d 15, 16 (2d Cir. 1989); <u>Wesolek</u> v. <u>Canadair Ltd.</u>, 838 F.2d 55, 57-59 (2d Cir. 1988);

83

McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P.

72, 6(a), 6(e).


Dated:          New York, New York
                February 26, 2008

                                          Respectfully submitted,


                                          _____
                                          **Andrew J. Peck**
                                          United States Magistrate Judge


Copies to:      Sara Gurwitch, Esq.
                Kelly Anne Librera, Esq.
                Eric Rosen, Esq.
                Sylvia Wertheimer, Esq.
                Judge Colleen McMahon


H:\ORD\WELLS-Terence